Nos. 2—09—0693 & 2—09—0694 cons.
Opinion filed April 20, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07—CF—2424 |
| WILLIAM S. FILLYAW, | ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07—CF—2431 |
| JOHNNY C. PARKER, | ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Jorgensen and Justice McLaren concurred in the judgment and opinion.

**OPINION**

Defendants, William S. Fillyaw and Johnny C. Parker (referred to as defendants collectively, and Fillyaw and Parker separately), were found guilty of the first-degree murder of Lasondra Shaw (Lasondra) and of the attempted first-degree murders of Lebraun Graham and Ernest Hughes. The

offenses arose from an incident that occurred shortly after midnight on June 29, 2007, when two armed men broke through the front door of Lasondra's apartment and opened fire, killing Lasondra and severely injuring Graham and Hughes. After hearing three or four shots, Deshae R. went to the window of her mother's apartment, located across the street from Lasondra's apartment, and saw two men running out the front door of Lasondra's apartment building and through an alley by the building. From photo arrays, she identified defendants as the men she saw. During trial, the trial court permitted the admission, as substantive evidence, of a written statement that State witness Ricky Powell had given to Detective Gianni Giamberduca. The statement detailed several alleged interactions between Powell and Fillyaw, including the allegations that Powell had facilitated the sale of a shotgun and shotgun shells to Fillyaw before the offense and that Fillyaw had told Powell that he and Parker went to rob some people, kicked down the door, and shot three people.

Fillyaw contends on appeal that his trial counsel rendered ineffective assistance (1) by failing to object to the admission of Powell's statement as substantive evidence pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—10.1 (West 2008)); and (2) by failing to file a motion to suppress the identification testimony of Deshae R. In a supplemental brief, Fillyaw contends that the trial court abused its discretion by restricting access to and cross-examination regarding Deshae R.'s mental health records and mental health diagnosis.

Parker contends on appeal that (1) his constitutional due process rights were violated when the prosecutor repeatedly elicited, and relied upon substantively, Fillyaw's hearsay statement explicitly inculpating Parker, who was tried jointly with Fillyaw before a single jury; (2) his trial counsel was ineffective for failing to request a severance based on the admission of the hearsay statement

inculpating Parker; and (3) the trial court improperly limited the disclosure of and cross-examination regarding Deshae R.'s mental health records and mental illness.

We consolidated the appeals for review, as the facts apply to both defendants and they were tried jointly before a single jury. For the following reasons, we reverse and remand both causes.

FACTS

On June 28 and 29, 2007, Lasondra, Damien Shaw, Lebraun Graham, Yetta Little, and Ernest Hughes were at Lasondra's apartment, located on the second floor of 900 13th Street, North Chicago. They were in Lasondra's living room playing cards, smoking marijuana, and drinking cognac. Around 12:30 a.m., someone kicked the front door twice. When the door opened, two men entered and starting shooting at everyone inside the apartment. Lasondra died from a gunshot wound and Graham and Hughes were seriously injured.

A. Pretrial Motions

Prior to trial, Fillyaw filed a motion to sever, which was denied. Two days later, Parker filed a separate motion to sever, arguing that the State would be introducing evidence of a shotgun connected to Fillyaw. The trial court denied this motion also.

Both defendants requested medical records for Deshae R., who was a minor at the time of the offense and the trial. Defendants learned that Deshae R. had been committed to Allendale Association, a mental health residential treatment facility, prior to the shooting, and had been recommitted in August 2008. The defense wished to probe her motivation for testifying, the reason she was committed, her treatment, her prescribed medications, and whether these medications affected her ability to testify. The trial court issued a subpoena and, after an *in camera* review of the

records, the court tendered to counsel the portion of those records that the court determined were relevant.

After the jury was selected but before the trial began, the State indicated that it did not expect Powell to cooperate, and it anticipated impeaching him with the statement that Powell had given to Giamberduca. The statement detailed several alleged interactions between Powell and Fillyaw that took place two months before the shootings and shortly after. The statement indicated that before the shootings Powell had facilitated the sale of a shotgun and shotgun shells to Fillyaw and that afterward Fillyaw had told Powell that he and Parker went to rob some people, kicked the door down, and shot three people. The State asked the court to determine which portions of the statement were relevant. Fillyaw's counsel objected to Powell's statement because it indicated that his client was a drug dealer and that he illegally possessed a shotgun. Parker's counsel argued that, when Powell made the statement, Powell was facing criminal charges and his appointed attorney was neither present for, nor informed of, his meeting with the detective. The court ruled that it would not allow any testimony regarding the sale of drugs but that it would permit examination of Powell's conversations with Fillyaw and Powell's testimony about the sale of the shotgun and ammunition.

## B. Trial

The evidence presented at trial, which began on April 13, 2009, revealed the following. Officer Michael O'Neill responded to the dispatch regarding the shooting. At the scene, he observed Lasondra lying on the kitchen floor. Hughes, who was in the living room, was yelling that he had been shot. In a back bedroom, O'Neill found two men, one of whom was Graham, who also was yelling that he had been shot. O'Neill said that an exterior light over the apartment building's front door was on when he arrived at the scene.

Forensic pathologist Eupil Choi performed the autopsy on Lasondra's body. Choi concluded that Lasondra suffered multiple shotgun wounds and that the cause of her death was a shotgun wound on the left side of her neck. The parties stipulated that Hughes and Graham suffered serious injuries as a result of the shootings.

Steven Kueber, an evidence technician, arrived at the scene within an hour of the crime, and he recalled that the exterior light over the front entrance to Lasondra's apartment was off. A video taken by Kueber around 2 a.m. was admitted into evidence. Kueber stated that the lighting shown in the video reflected the actual lighting conditions at the time it was made. He recollected no exterior lighting anywhere near the building's front and stated that the entire street around it was dark. Kueber identified photographs of a cell phone found in an alley on the building's west side.

Witnesses established that the cell phone and a service contract for that phone had been purchased by Parker a few days before the shooting. Parker's home was located about two blocks away from this alley. Detectives recovered shotgun shell casings and spent handgun casings at Lasondra's apartment, but they did not recover any weapons. Other photos showed Lasondra on the kitchen floor, bloodstains throughout the apartment, and damage to the front door. No fingerprint or footprint evidence was recovered and no DNA comparisons were performed. At 7 p.m. on June 29, detectives searched Parker's home but did not recover any human tissue or blood evidence.

### 1. Identification Testimony

### a. Little's Testimony

Little did not see either offender's face because, according to her, both men wore masks exposing only their eyes. Little saw one of the offenders, wearing a brownish jacket, stand over one of the male guests in the living room and say, "Die motherfucker die," as he shot that guest with a

-5-

large black gun. Little identified a jacket as the jacket worn by that offender. Giamberduca identified the same jacket as that worn by Parker at the time of his arrest. The other offender wore all black. Shortly after the shootings, Little observed the offenders flee from the apartment.

### b. Graham's Testimony

Graham maintained that the offenders' faces were not covered and that he recognized defendants, having seen them a few times on the streets. Graham observed Fillyaw fire a shotgun and Parker fire a handgun. Graham ran to a back bedroom after Fillyaw shot him in the shoulder and he did not see the offenders escape. The entire incident lasted seven to eight minutes.

The police interviewed Graham at the hospital following Graham's shoulder surgery, approximately 13 hours after the incident. Graham identified defendants from two separate photo arrays. At the time, Graham was medicated on morphine and in a great deal of pain. Before making the identifications, Graham had spoken with several members of his family. Graham claimed that, during the police interview at the hospital, he also identified a third offender, Earl Epps, who stood outside the apartment during the shooting. Giamberduca denied that Graham had mentioned Epps to him during the hospital interview. According to Giamberduca, Graham first mentioned Epps over a month after the incident, when Graham voluntarily approached the police to provide a statement he drafted in which he claimed that Epps was the second offender to enter the apartment. Although Graham testified at trial that he did not witness the offenders flee, in his drafted statement Graham claimed that he saw all three offenders leave the apartment. Graham also chose Epps' photo from a photo array.

Four months prior to trial, Graham told representatives of the State's Attorney's office that he had mistakenly identified Epps in connection with the case. During his testimony at trial, Graham admitted that he no longer believed that Epps was present at the scene.

At the time of trial, Graham was in jail waiting to be conveyed to prison, having recently pled guilty to charges of escape, fleeing and eluding, and some traffic offenses. Graham's attorney had discussed the possibility of Graham receiving leniency in exchange for the guilty plea. However, at trial, Graham stated that his testimony in the present case was not part of the plea deal.

### c. Deshae R.'s Testimony

Giamberduca spoke to Deshae R. on July 29, 2007, around 6:30 a.m. She said that she heard three or four gunshots and looked out the window of her mother's second-floor apartment. The window faces 13th Street and is across that street from the building where the shootings occurred. From around 11:30 p.m. to 12:30 a.m., Deshae R. was the only person still awake in the apartment. She saw two people run out the front door of Lasondra's apartment building toward an alley on the west side of the building and then head north up the alley. Later that day, Deshae R. identified defendants from two separate photo arrays. She claimed that both defendants carried guns; one gun was long and the other was short. She described one person as having facial hair and the other as having no facial hair, but she admitted that she did not get a good look at them. She wrote "hand gun" on the photo from the array that contained Parker's photo. She wrote "land gun" on the photo that she chose from the array that contained Fillyaw's photo, because that man carried a long gun when he ran from the scene. However, she could not identify defendants as those individuals in court. She also acknowledged that, when she identified defendants from the photo arrays, she was being very compliant with the police, as she knew that her mother did not want them inside their home and

she wanted them to leave as soon as possible. Deshae R. did not write a statement for the police because she was unable to write.

Deshae R. claimed that, as she looked out, she was able to see a man with his arm blown off, but she later admitted that she had heard about this rather than having personally witnessed the injury. Deshae R. stated that her mother's apartment building was "over to the right" of the scene depicted in a photo and she acknowledged that the streetlight shown in the photo was broken at the time of the shooting. Deshae R. also claimed that, on the following morning, she was able to see blood on the walls of Lasondra's second-floor apartment when she stood in front of the building. Deshae R. was 16 years of age at the time of the incident.

During cross-examination, Deshae R. stated that, prior to May 2007, she had been a student at Allendale, a residential treatment facility for adolescents with behavioral, emotional, and psychological disorders. While at Allendale in 2007, Deshae R. was prescribed Lamictal and Risperdal. Defense counsel asked why Deshae R. had been prescribed those medications, but the trial court would not allow her to answer, based on relevancy. However, Deshae R. was allowed to testify that, in May 2007, she left Allendale of her own volition and ceased taking her medications. Deshae R. had not taken those medications for several weeks prior to the incident.

2. Powell's Testimony and Handwritten Statement

Powell's handwritten statement to Giamberduca indicated that Powell had helped Fillyaw purchase a shotgun and some ammunition two months prior to the shootings. The statement also alleged that, the last time Powell talked to Fillyaw, Fillyaw told Powell that Fillyaw and "John Park[1]

---

[1]The parties construe this as a reference to Parker.

went to rob some people and they shoot [*sic*] three people ***. Fillyaw told me when they got there that they kick[ed] the door down and started shooting."

At trial, the State presented Powell's statement. Powell testified that he gave the statement to Giamberduca on January 14, 2008. He acknowledged speaking with Giamberduca and preparing the statement. However, he maintained that the entire document was false.

Powell testified that he had been a serious heroin addict and that he gave the statement hoping to be released from jail to resume his habit. Powell was not taking heroin when he met Giamberduca and was not experiencing the effects of withdrawal at the time. Powell testified that he indicated in his statement that he had facilitated the sale of a shotgun and some 12-gauge shotgun shells to Fillyaw two months before the shootings. Powell testified that his statement described conversations and events that never occurred. He said that he included the false allegations only to make his statement seem believable.

The prosecutor proceeded to confront Powell with his statement. Powell acknowledged that he signed the statement on January 14, 2008, but he repeatedly insisted that it was false. Powell's statement revealed the following. In early April 2007, he traded crack cocaine for a shotgun. He then sold the shotgun to Fillyaw. Later, at Fillyaw's request, Powell arranged for Fillyaw to buy some shotgun shells from a third party. A few weeks after that, Fillyaw showed Powell the shotgun that Powell had sold to Fillyaw, which Fillyaw had sawed down. The last time Powell talked with Fillyaw, Fillyaw told him that defendants went to rob some people, kicked the door down, started shooting, and shot three people.

When the prosecutor moved to admit the statement into evidence against both defendants, Parker's counsel objected on the ground that it was not inconsistent with Powell's trial testimony.

The court admitted the statement as substantive evidence pursuant to section 115—10.1 of the Code (725 ILCS 5/115—10.1 (West 2008)).

Powell explained that, at the time he drafted the statement and spoke with the detective, he was in Lake County jail awaiting trial for a residential burglary charge. The detective offered to help him get out of jail if he made the statement. Powell's counsel was neither informed of nor present for this interview. The State dismissed the residential burglary charge, and Powell pleaded guilty to the lesser charge of theft. He received a 30-month sentence. Although Powell did not receive any consideration in that case, he acknowledged that, in return for his testimony, the State had agreed not to charge him with any offenses related to the contents of the statement. The State also promised not to charge him, based on his statement or testimony, with perjury, filing of a false police report, or obstruction of justice.

Powell testified on cross-examination that, in the fall of 2007, he worked as a confidential informant with Sergeant Edgar Navarro of the Waukegan Narcotics Enforcement Team (NET), and Powell was responsible for setting up narcotics transactions with local dealers. Because of his heroin addiction, Powell would inform the detectives that the heroin cost more than it did, so he could obtain extra heroin and keep it for his own use.

Navarro confirmed Powell's claim that he worked as a paid informant but said that it was never the policy of the NET to supply confidential informants with drugs. Navarro denied ever having any reason to believe that Powell was using heroin, as Powell would always make his appointments and was able to draft a written statement after each drug buy. However, Navarro admitted that Powell was never tested for drugs during this time. Navarro stated that Powell was

never allowed to bring his own money to the drug buys and, when Powell returned from each buy, he had no money on his person and the narcotics would be seized from him.

During Giamberduca's testimony, the prosecutor again elicited the substance of Powell's statement, including Powell's allegations that he had sold Fillyaw a shotgun and that Fillyaw had admitted to Powell that he and Parker kicked down a door and shot three people. Giamberduca testified on cross-examination that, during his January 14 meeting with Powell, Powell did not mention his residential burglary case and did not admit to being a heroin addict. Powell informed Giamberduca only that he had used crack cocaine in the past. Giamberduca never checked into Powell's background.

### 3. Defense

Defendants presented separate defenses. Fillyaw's girlfriend, Crystal Brown, testified that on January 28, 2007, and the following morning, she and Fillyaw were at their home in Wisconsin. Between January 2007 and June 29, 2007, Fillyaw lived with Brown in a condominium in Pleasant Prairie, Wisconsin. Brown was a full-time customer service trainer at an insurance company in Lake Forest. She recalled that, on June 28, 2007, Fillyaw picked her up from work at 5 p.m. and drove her home. He left at 6 or 6:30 p.m. while Brown made them cheeseburgers, and he returned around 7 or 7:30 p.m. Brown and Fillyaw spent the evening eating dinner and watching television. They went to sleep in their shared bed around 9 p.m. They had two dogs that would bark if either Fillyaw or Brown got up. The dogs slept through the night without any disturbance.

Brown said that the police rebuffed her efforts to inform them of Fillyaw's alibi shortly after his arrest. Assistant Commander Don Smith testified that any leads developed during the investigation of the shootings were pursued by the police. Officer Jason Baldowsky met with Brown

and her attorney on July 6 and July 9, 2007, but stated that she said only that she and Fillyaw lived together in June 2007, and she did not provide specific information regarding Fillyaw's whereabouts on June 28 and 29, 2007. The parties stipulated that state records listed a Zion, Illinois, address for Fillyaw.

Parker's cousin, Eddie Washington, testified that, at about 4 p.m. on June 28, 2007, he saw Parker at the home of Brenda Nash, who was Parker's mother and Washington's aunt. Parker made phone calls from Nash's house phone and then left.

Officer Wail testified that Graham remained conscious the whole time that Wail interviewed him at the crime scene on June 29. Wail did not ask Graham who the shooters were and Graham did not volunteer that information.

Mary Wong, a forensic scientist, tested the cuffs of both sleeves of Parker's jacket and found no firearm residue. Wong agreed, however, that residue can be removed from clothing by brushing it against something.

Two witnesses, Tony Altof, owner of a clothing store at Gurnee Mills shopping mall, and Jennifer Shurts, an employee of a clothing store in Lake County, each testified that Parker's jacket was a popular, readily available style at the time of the shootings.

Angela Almenderez, a social worker at Allendale, testified that she was familiar with Deshae R.'s case, but the trial court prevented the defense from asking her about Deshae R.'s diagnosis, the effects of her medications, or the "substance" that Deshae R. was taking. The court ruled that Almenderez's testimony would not impeach Deshae R.'s testimony, because Deshae R. had already testified to much of this information. In addition, the court would not permit Almenderez to testify

to Deshae R.'s medical or psychiatric diagnosis. The court later denied Parker's request to admit into evidence a redacted copy of Deshae R.'s mental health assessment from Allendale.

### 4. Closing Arguments

During closing arguments, the prosecutors made several references to Deshae R.'s identifications and the portion of Powell's statement regarding Fillyaw's alleged admission that he and Parker had kicked in a door and shot three people. The jury also received a copy of Powell's statement to use during its deliberations. Parker's attorney did not seek to redact Fillyaw's admission or otherwise object to its inclusion.

### C. Jury Verdict, Posttrial Motions, and Sentencing

The jury received its instructions. After sending two notes to the judge during deliberation, the jury found both defendants guilty of the first-degree murder of Lasondra and the attempted first-degree murders of Graham and Hughes.

Defendants filed a joint posttrial motion, arguing, *inter alia*, that the trial court erred by refusing to sever the trial; admitting Powell's statement to Giamberduca; allowing Powell to testify to Fillyaw's admission that directly implicated Parker; and refusing to admit Deshae R.'s Allendale records. Following a hearing, the trial court denied the motion and sentenced each defendant to 55 years' imprisonment for Lasondra's murder and two consecutive 10-year sentences for the attempted murders of Hughes and Graham. Defendants' motions to reconsider the sentences were denied. Defendants timely appeal.

### ANALYSIS

### FILLYAW'S APPEAL

We turn first to Fillyaw's appeal, in which he raises three issues. The first two issues relate to counsel's ineffective assistance for failing (1) to object to the admission of Powell's statement as substantive evidence under section 115—10.1 of the Code and (2) to file a motion to suppress Deshae R.'s identification. Fillyaw concedes that the portion of Powell's statement relating to the shotgun and ammunition was admissible under section 115—10.1.

We evaluate claims of ineffective assistance of counsel under the standard annunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). The *Strickland* test has two components. First, a defendant contending that he received ineffective assistance of counsel must demonstrate that counsel's performance was deficient. *People v. Moore*, 279 Ill. App. 3d 152, 157 (1996). To do so, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Although counsel's conduct is afforded a strong presumption that it constitutes sound trial strategy (*Moore*, 279 Ill. App. 3d at 157), this presumption may be overcome where no reasonably effective criminal defense attorney, confronting the circumstances of the defendant's trial, would engage in similar conduct (*People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002)). To prevail on an ineffective-assistance-of-counsel claim, a defendant must also demonstrate that, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different. *Moore*, 279 Ill. App. 3d at 159 (citing *Strickland*, 466 U.S. at 695). In other words, the defendant must demonstrate that he was actually prejudiced by the deficient representation he received. *Moore*, 279 Ill. App. 3d at 157. To make this showing, the defendant need not show that the evidence that is not attributable to counsel's errors would have been insufficient to sustain

the conviction. *Moore*, 279 Ill. App. 3d at 160. Rather, the defendant need show only that it is plausible that the result of the trial would have been different absent counsel's errors. *Fletcher*, 335 Ill. App. 3d at 455. If it is easier to demonstrate that the claimed errors could not have prejudiced the defendant, a reviewing court may affirm the defendant's conviction on that basis alone. *Strickland*, 466 U.S. at 697.

A statement made to a testifying witness by a third party describing events of which the testifying witness has no firsthand knowledge is inadmissible as substantive evidence under section 115—10.1(c)(2) of the Code. *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008); *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000); *People v. Coleman*, 187 Ill. App. 3d 541, 547 (1989). Without doubt, Powell's allegation that Fillyaw admitted that he and Parker kicked down the door and shot three people was inadmissible as substantive evidence under section 115—10.1(c)(2) because it was not based on Powell's personal knowledge.

The State concedes that the trial court erred by admitting this portion of Powell's statement as substantive evidence, but it raises several arguments in support of affirmance. We reject those arguments. In particular, we reject the State's assertion that Fillyaw's counsel properly objected to the admission of the statement, as a review of the record shows otherwise.

After *voir dire* was completed, the prosecutor told the court that he thought Powell might refuse to cooperate on the witness stand. The prosecutor referred to Powell's statement and, after describing the portion of the statement concerning the shotgun and ammunition sales, the prosecutor turned to Powell's allegation that Fillyaw had told Powell that he and Parker had "kicked in a door of an apartment and shot three people which is essentially confessing to this offense." Fillyaw's counsel initially reacted to the prosecutor's comments by expressing concern about the references to

Fillyaw's having sold cocaine. Counsel further argued that, because the State could not prove that the shotgun Fillyaw had bought from Powell was the one that was used in the shootings, the portion of the statement referring to the shotgun and ammunition sales was irrelevant. Parker's counsel expressed concern over whether Powell had access to counsel when he made the statement. Neither defense attorney mentioned the portion of the statement that the State characterized as a confession to the instant offenses.

The trial court cited Fillyaw's alleged admission to Powell that he and Parker had kicked in a door and shot three people as a factor favoring its decision to allow the State to use as evidence the references to the shotgun and ammunition purchases. Fillyaw's counsel made no argument that Fillyaw's alleged admission to these crimes was inadmissible under the personal-knowledge limitation of section 115—10.1(c)(2). The court ultimately ruled that Powell's statement was admissible but ordered the State to redact the references to Fillyaw having sold cocaine.

During the State's examination of Powell on the witness stand, Powell admitted that he had made the statement to Giamberduca, but Powell maintained that the entire statement was false. Fillyaw's counsel objected, citing only "foundation" as the ground. Counsel did not elaborate on his objection, which was overruled. The prosecutor proceeded to present to Powell the contents of the statement, line by line, repeatedly eliciting his admissions that he had written the statement and his claims that his allegations were false. When the prosecutor reached the part concerning the shotgun purchase, counsel stated that he had a continuing objection to the testimony, but he stated no grounds for his objection. When the prosecutor addressed Fillyaw's purchase of shotgun shells, counsel objected that it was improper impeachment under section "110 [*sic*]." Counsel asked for a limiting instruction if it was not offered for the proof of the matter asserted, and the court responded that it

might be substantive evidence. Counsel replied that the court needed to make that determination, and the court responded that it would do that "right now." However, the court did not do so immediately and counsel did not request such a determination again.

Prior to confronting Powell with the statement's claim that Fillyaw had admitted that he and Parker had kicked down a door and shot three people, the prosecutor paused to confirm which portions of the statement had been ruled admissible. The court ruled that the one reference to cocaine sales was inadmissible. Fillyaw's counsel then remarked, "Judge, we might as well just finish off the statement right now. He'll say he wanted to rob some people, and that he and Johnny Parker wanted to rob some people." The court informed counsel that the statement was more specific than that and the prosecutor then summarized Fillyaw's alleged admission that he and Parker had kicked down a door and shot three people. After confronting Powell with the portions of the statement that the court had deemed admissible, the prosecutor moved for its formal admission into evidence. Counsel objected that it should not come in substantively, based on improper foundation and the "rules of evidence specifically for an out-of-court statement offered to prove the truth of the matter asserted." When the court told counsel that it was admitted under section 115—10.1, counsel stated that it was improper impeachment; that he "didn't ask him if any of these events occurred, it is an improper way to put it in *** and then impeach him on it." The court ruled that the State had laid a proper foundation for admission of Powell's statement as substantive evidence.

We agree with Fillyaw that his counsel's objections referring to substantive and impeachment evidence reveal that he did not understand that section 115—10.1 addresses only substantive evidence. Counsel's unfamiliarity with the law was also established by his effort to keep out those portions of Powell's statement concerning the gun and ammunition sales, which were admissible as

based on Powell's personal knowledge, while the allegation that Fillyaw admitted that he had robbed and shot some people was inadmissible on the meritorious grounds of lack of personal knowledge.[2] Counsel did not minimize the effect of the evidence by requesting a contemporaneous jury instruction. Counsel also failed to properly address the error in the posttrial motion, where he argued that Powell's statement violated the *Bruton* rule, set forth in *Bruton v. United States*, 391 U.S. 123 (1968). Although Parker has a *Bruton* claim based on the admission of the statement's allegation that Fillyaw inculpated himself and Parker, Fillyaw, who allegedly made the admission, does not.

The constitutional guarantee of effective assistance of counsel requires a criminal defense attorney to use the applicable rules of evidence to shield his client from a trial based upon unreliable evidence. *Moore*, 279 Ill. App. 3d at 159. As aptly stated in *Moore*:

> "Considering all of the circumstances, indulged in with a strong presumption favoring reasonable professional assistance, we cannot construe the challenged performance of counsel as a matter of sound trial strategy. Sound trial strategy is made of sterner stuff. It embraces the use of established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts. Counsel's performance

---

[2]Fillyaw maintains on appeal that this portion of Powell's statement was also not admissible as impeachment. We concur. At trial, the State knew that Powell was not going to cooperate. The State can attack its own witness's credibility only if the witness affirmatively damages the State's case. *People v. Cruz*, 162 Ill. 2d 314, 361-62 (1994). Under the circumstances in this case, the State could not have called Powell for the sole purpose of admitting his statement as impeachment, knowing Powell would recant it.

was not objectively reasonable. The defendant did not receive reasonably effective assistance of counsel." *Moore*, 279 Ill. App. 3d at 159.

We hold that counsel's apparent unfamiliarity with the law and failure to object on the proper grounds to the improper admission of Powell's statement was unprofessional (see *People v. Hayes*, 229 Ill. App. 3d 55, 61 (1992)), and his performance thus meets the first prong of the *Strickland* standard.

Having found that counsel's representation fell below an objective standard of reasonableness, we must next address whether the record reveals that, but for counsel's unprofessional errors, there is no reasonable probability that the outcome of Fillyaw's trial would have been different. Under the *Strickland* test for constitutional deprivation, we are constrained from providing a defendant relief solely upon the basis of his attorney's level of performance. The test measures the performance against its potential effect on the outcome of the case. Therefore, even where counsel's mistakes are egregious, we are required to examine them in the context of all of the evidence in the case to determine whether they created a reasonable probability of a different result. *Moore*, 279 Ill. App. 3d at 159.

From our review of the proceedings, we find a reasonable probability that but for counsel's unprofessional errors the outcome of this trial would have been different. Fillyaw was found guilty based principally on Graham's claim that he knew defendants prior to the shootings and recognized both of them at the crime scene. As to Parker, the claim was corroborated by Little's identification of Parker's jacket as the jacket worn by one of the shooters and the discovery of Parker's cell phone in an alley next to the building where the shooting occurred. However, absent some proof linking Fillyaw to Parker and to the crime scene, the jacket and cell phone did not increase the likelihood that

Graham's identification of Fillyaw was accurate. Other than Graham's testimony, the only evidence tying Fillyaw to Parker was Fillyaw's alleged admission to Powell inculpating himself and Parker and Deshae R.'s identification of defendants as the two men she saw flee the scene.

However, Graham's and Deshae R.'s credibility was questionable. Graham claimed that the shooters were not masked and that he saw their faces, but Little averred that the faces were covered. Graham, who had an extensive criminal history, did not identify the shooters until the afternoon following the shootings, after his surgery. He was taking morphine at the time and had talked with his family before the police interviewed him. Graham also identified a third offender, Epps, but later retracted this, which indicated that his identification was suspect. Deshae R. could not identify defendants in court and acknowledged that she did not get a good look at them.

In addition, as pointed out by Fillyaw, the prejudicial effect of Powell's statement was magnified when (1) the State emphasized the statement as an admission of guilt during trial and closing and rebuttal arguments; (2) the jury was able to reread Powell's statement during its deliberations; and (3) the jurors were presented with an improper instruction that they could consider the prior inconsistent statement as substantive evidence. A confession is the most powerful piece of evidence the State can offer, and its effect on the jury is incalculable. See *People v. R.C.*, 108 Ill. 2d 349, 356 (1985). Accordingly, we hold that Fillyaw has demonstrated under the second *Strickland* prong that, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different, and we must reverse his convictions.

In order to address whether a new trial would subject Fillyaw to double jeopardy, we find that the evidence presented against Fillyaw was such that the jury could have concluded that he was proved guilty beyond a reasonable doubt. Physical evidence connecting a defendant to a crime has

never been necessary to establish guilt. *People v. Hernandez*, 121 Ill. 2d 293, 319 (1988). The determinations of the credibility of witnesses and the weight to be given to their testimony are responsibilities that must be left to the trier of fact. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). When deciding if the evidence was sufficient to sustain a conviction, for double jeopardy purposes, this court may consider all of the evidence admitted at trial, even the erroneously admitted evidence. If, viewing all the evidence in the light most favorable to the State, a rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, there is no double jeopardy bar to retrial. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). A rational trier of fact could have found Fillyaw guilty beyond a reasonable doubt based on Graham's identification of Fillyaw as one of the shooters and Deshae R.'s identification of Fillyaw as one of the men she saw running from the scene. Accordingly, retrial of Fillyaw would not constitute double jeopardy.

PARKER'S APPEAL

We also must reverse Parker's convictions. Here, unlike in Fillyaw's appeal where his counsel ineffectively failed to object to the admission of Powell's statement as substantive evidence, Parker's state and federal constitutional rights were violated by the admission of Powell's statement explicitly inculpating Parker, irrespective of defense counsel's failure to properly object to the admission of the statement. Parker contends that his rights were violated in that he was tried jointly with Fillyaw before a single jury, and the prosecutor repeatedly elicited, and relied upon substantively, Fillyaw's hearsay statement explicitly inculpating Parker. We agree.

Parker alleged in his posttrial motion that his constitutional rights were violated by the admission of Powell's statement, but he did not object on this basis at trial. To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial

motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Thus, by failing to raise this objection at trial, Parker did not preserve the issue and has forfeited appellate review of his claim.

The parties raise alternative arguments applying plain-error and harmless-error review to this case. When a defendant has forfeited appellate review of an issue, as in this case, we conduct a plain-error analysis on review. A harmless-error analysis is conducted when a defendant has preserved an issue for review. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010).

Although Parker has forfeited the issue, the plain-error rule can bypass normal forfeiture principles and allow a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). We apply the plain-error doctrine when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error
> alone threatened to tip the scales of justice against the defendant, regardless of the seriousness
> of the error, or (2) a clear or obvious error occurred and that error is so serious that it
> affected the fairness of the defendant's trial and challenged the integrity of the judicial
> process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551,
> 565 (2007).

In *Bruton*, 391 U.S. at 124-25, the trial court permitted a postal inspector's testimony regarding a nontestifying codefendant's admission that directly inculpated the defendant in the crime. The trial court admitted the statement into evidence, but it gave a limiting instruction on the statement's incompetence as against the defendant. The Supreme Court reversed, holding that the admission of the statement at the joint trial violated the defendant's right to due process under the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV). *Bruton*, 391 U.S. at 130-32. The Court held that the statement was impermissible hearsay and that a

codefendant's hearsay statements implicating the defendant are "devastating" in a jury trial, while, at the same time, they are "inevitably suspect." *Bruton*, 391 U.S. at 136. The Court further held that it was impossible for any reasonable juror to follow an instruction to disregard a codefendant's statement in determining a defendant's guilt and that such an instruction could not preserve a defendant's due process right to a fair trial. *Bruton*, 391 U.S. at 130. Because the admission of a nontestifying codefendant's admission explicitly inculpating the defendant is, by its very nature, inimical to a fair trial, such error required reversal and a remand for a new trial. *Bruton*, 391 U.S. at 136.

The Illinois Supreme Court in *People v. Duncan*, 124 Ill. 2d 400 (1988), found that the admission of such hearsay evidence constituted reversible error, independent of federal constitutional due process rights, because it was impossible for a juror to divest himself, even with limiting instructions, from the effect of such evidence. *Duncan*, 124 Ill. 2d at 413-14. Unless some other exception to the hearsay rule applies, Illinois courts have allowed admission of such statements at joint trials only reluctantly, only with proper limiting instructions, and only if the statements are cleansed of all references to nondeclaring defendants. *Duncan*, 124 Ill. 2d at 414; see also *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (wherein the Supreme Court held that a defendant's federal constitutional right of confrontation is not violated by the use at a joint trial of a nontestifying codefendant's confession, although the defendant is linked to the confession by other evidence, when the confession is redacted to eliminate even anonymous references to the defendant and when the jury is properly instructed not to use the confession against the defendant).

In this case, there was no such redaction of Powell's statement. In addition, no specific instruction was given regarding the statement. The court gave some general instructions to the jury,

including Illinois Pattern Jury Instructions, Criminal, Nos. 3.06—3.07 (4th ed. 2000), directing the jury to give separate consideration to each defendant and instructing that any evidence that was limited to one defendant should not be considered as to the other. The only limiting instruction given was Illinois Pattern Jury Instructions, Criminal, No. 3.08 (4th ed. 2000), which states that "a statement made by one defendant may not be considered by you as against any other defendant."

Although this general limiting instruction was given, no contemporaneous instruction to disregard the statement when considering Parker's guilt was given to minimize the statement's effect. See *Duncan*, 124 Ill. 2d at 411 (error not to give contemporaneous instruction with codefendant's confession). *Bruton* could not "accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination" in a case where a nontestifying codefendant's "powerfully incriminating extrajudicial statements" of doubtful credibility were introduced in a joint trial, even though the jury was instructed to disregard the statements in determining the defendant's guilt or innocence. *Bruton*, 391 U.S. at 124-25, 135-37. As noted in *Duncan*, while it is often reasonable to assume that a jury has followed a judge's limiting instructions concerning evidence admitted for one purpose but not for another, " 'there *** are consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' " *Duncan*, 124 Ill. 2d at 406 (quoting *Bruton*, 391 U.S. at 135); see, *e.g., Hernandez*, 121 Ill. 2d at 316 (where it was obvious that, in the hearsay testimony, codefendants referred to defendant in redacted statements in joint trial, and aggravating the effect of those improper redactions was the State's disclosure to the jury that they were not hearing the full story). Here, as in *Duncan* and *Bruton*, this case does not present facts sufficient for the admission of Powell's statement regarding Fillyaw's extrajudicial

admission. The admission of such a statement at a joint trial, absent a total deletion of all references to Parker, violated established Illinois case law, independent of *Bruton*.

The State does not contest that the court committed a *Bruton* violation. The State argues, among other things, that the evidence is not closely balanced and therefore the error was harmless. We observe that, because a *Bruton* violation implicates both due process and confrontation clause rights, it necessarily affects substantial rights and satisfies the second prong of the plain-error analysis. See *People v. Reeves*, 271 Ill. App. 3d 213, 220 (1995) (plain error applicable as evidence is closely balanced and error affected defendant's substantial rights); *People v. Campbell*, 115 Ill. App. 3d 631, 636 (1983). The error here was obviously serious. Not only was the statement admitted during Powell's testimony, but it was also referred to during Giamberduca's testimony and then repeated by the prosecutor in closing and rebuttal arguments. Compounding the error, the substance of the statement was used improperly as substantive evidence against Parker, and a copy of the statement went to the jury for its deliberations. *Cf. People v. Lucas*, 48 Ill. 2d 158, 163 (1971) (citing *Chapman v. California*, 386 U.S. 18 (1967)) (applying a harmless-error analysis and finding, in light of the totality of the evidence, that a *Bruton* violation was harmless beyond a reasonable doubt). We conclude that the error in this case requires reversal.[3]

---

[3]Parker asserts in a footnote that Powell's statement recounting Fillyaw's admission was not admissible as substantive evidence under section 115—10.1 of the Code. However, he does not develop this argument. As we held in Fillyaw's appeal, the trial court erred by admitting the statement as substantive evidence because Powell had no firsthand knowledge. A statement that was made to the testifying witness by a third party describing events of which the testifying witness has no firsthand knowledge is inadmissible as substantive evidence under section 115—10.1(c)(2). See

Regarding double jeopardy, we hold that a reasonable trier of fact could have found Parker guilty beyond a reasonable doubt based on the identification testimony of Graham and Deshae R., Parker's cell phone found in the alley at the scene, and Little's identification of Parker's jacket as the one worn by one of the offenders. Accordingly, retrial of Parker would not violate double jeopardy principles.

Because we have reversed defendants' convictions, we need not address the other issues raised in their appeals, except the arguments concerning Deshae R.'s mental health records, as this issue could arise on retrial. While we need not examine the scope of cross-examination, we observe that the mental health history of a witness is relevant as it relates to credibility, and it is thus a permissible area of impeachment. But before such evidence may be introduced, its relevance must be established. *People v. Flowers*, 371 Ill. App. 3d 326, 330 (2007). Issues relating to a witness's diagnosis and psychotropic medications and any evidence of hallucinations may be relevant to that witness's credibility. *Flowers*, 371 Ill. App. 3d at 330. Upon our *in camera* review of Deshae R.'s mental health records, we find that they contain information concerning her diagnoses, medications, and history of hallucinations, which may be relevant under *Flowers* as to her credibility and ability to perceive the occurrence about which she testified. On remand, the trial court should conduct a further *in camera* review of the records and tender to the attorneys those documents, or portions

---

*McCarter*, 385 Ill. App. 3d at 930; *Morgason*, 311 Ill. App. 3d at 1011; *People v. Coleman*, 187 Ill. App. 3d at 547. We observe further that the court erred by instructing the jury, pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000), to consider Powell's statement containing Fillyaw's admission not only as substantive evidence but also as impeachment.

thereof, containing potentially relevant information pursuant to *Flowers*. The trial court, in its discretion, may enter any protective orders it deems appropriate.

CONCLUSION

The judgments of the circuit court of Lake County in both cases are reversed and the causes are remanded for further proceedings consistent with this opinion.

Reversed and remanded.