# Illinois Official Reports

## Appellate Court

---

### *People v. Fillyaw*, 2018 IL App (2d) 150709

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM S. FILLYAW, Defendant-Appellant.–THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY C. PARKER, Defendant-Appellant. |
| District & No. | Second District<br>Docket Nos. 2-15-0709, 2-15-0710 cons. |
| Filed<br>Rehearing denied | December 19, 2018<br>February 14, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, Nos. 07-CF-2424, 07-CF-2431; the Hon. Mark L. Levitt, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, Steven E. Wiltgen, and Josette Skelnik, of State Appellate Defender's Office, of Elgin, for appellant William Fillyaw.<br><br>James E. Chadd, Patricia Mysza, and Yasaman Hannah Navai, of State Appellate Defender's Office, of Chicago, for other appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, David J. Robinson, and Joan M. Kripke, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                              JUSTICE BURKE delivered the judgment of the court, with opinion. Presiding Justice Birkett and Justice McLaren concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a retrial ordered by this court in *People v. Fillyaw*, 409 Ill. App. 3d 302, 320 (2011) (*Fillyaw I*), two separate juries found defendants, William S. Fillyaw and Johnny C. Parker, guilty of the first degree murder of Lasondra Shaw and two counts of attempted murder, one as to Lebraun Graham and the other as to Ernest Hughes. Defendants filed separate appeals (Nos. 2-15-0709 and 2-15-0710). On this court's own motion, we consolidated the appeals, based on an issue affecting both defendants, namely, whether the trial court erred in denying their requests to impeach Graham's testimony from the first trial with his affidavit recanting his identification of Fillyaw as the person who shot him. Graham was found unavailable before the second trial, and the trial court allowed the State to present his prior testimony but found the recanting affidavit inadmissible because it was a "highly unreliable document" that "lacked foundation." We reverse and remand the cause for a new trial.

¶ 2                                I. FACTS
¶ 3                    A. Background and Relevant Pretrial Motions
¶ 4    As set forth in *Fillyaw I*, the offenses arose from an incident that occurred around midnight on June 29, 2007. Two armed men broke through the door of Shaw's apartment. One of the men was armed with a shotgun and the other with a pistol. Present with Shaw were Graham, Hughes, Damian Shaw, and Yetta Little. Lasondra Shaw was killed and Graham and Hughes were shot. Little and Damian Shaw were unharmed.

¶ 5    At the first trial, Graham and Little testified as to the events in the apartment. Another witness, Deshae Rodgers, testified at both trials that she heard shots and looked through the window of her mother's apartment, located on the second floor of the building across the street from Shaw's apartment, and saw defendants run out the front door of the building. Before the second trial, the trial court found Graham unavailable because the State was unable to procure Graham's presence, and the court allowed the State to read to the juries his testimony from the first trial. Little also was found unavailable because she asserted that she had no memory of the events in the apartment, and her testimony from the first trial also was read to the juries.

¶ 6    Also prior to the second trial, defendants filed a motion *in limine* to admit Graham's notarized affidavit. They asserted that they could use the affidavit to impeach Graham if he were present to testify. They also stated that the notary would be available to testify to the affidavit's authenticity. Graham's affidavit states:

> "1-23-14
>
> I Lebraun Graham write this affidavit to say that I never saw who shot me On 7-17-07 truth be told the North Chicago police lead me to believe that William Fillyaw was the one who shot me[.] I don't want a innocent man in jail for this incident when he's not the person who shot me."

¶ 7     The word "Sincerely" and Graham's signature appear below the statement. The document has the notary seal of Janice K. Matheu, is dated March 26, 2014, and has Matheu's signature on the notary line. The court denied the request to admit the affidavit because the affidavit mistakenly stated that the shooting took place on July 17, 2007, when the shooting in fact took place on June 29, 2007.

¶ 8     Parker moved to reconsider. At the hearing on the motion, Janice Caraballo, née Matheu, testified that she is a notary public. Although she did not recognize Graham's affidavit, specifically remember the person who signed it, or remember notarizing it, she testified that she did notarize it because her signature was on it. Caraballo testified that she follows a particular procedure in notarizing a document. First, she asks if the notarization has to do with legal property. Then she asks to see a state photo identification or driver's license and to see the document signed in front of her. Caraballo did not recall whether or which identification was shown to her for executing the affidavit, but she stated that she would not have "notarized this document without proper identification." She also said that, because she requires that an individual sign a document in front of her, the affidavit was signed in front of her.

¶ 9     Parker's counsel suggested that the State exaggerated efforts by police officers to locate Graham. The trial court refused counsel's request to examine the officers under oath. Also, counsel asked if the trial court was ruling that it would not allow the use of Graham's affidavit for impeachment if Graham testified. The trial court stated that it was not "going to add anything else to my ruling, nor will I speculate." The court denied Parker's motion to reconsider.

¶ 10                                    B. Trial

¶ 11    The evidence presented at trial essentially mirrored that presented in *Fillyaw I*. As stated, defendants were tried together before separate juries. The court found Graham and Little unavailable, and their testimony from the first trial was read to the juries.

¶ 12    Graham was in jail when he testified at the first trial, having pled guilty to a charge of escape. He claimed that he was not given consideration in exchange for his testimony against defendants and that he wanted only to identify the shooters. Graham admitted to prior convictions of possession of a controlled substance, mob action, aggravated fleeing and eluding, obstruction of justice, possession of a stolen motor vehicle, and possession of firearms.

¶ 13    Graham testified that he had seen the two shooters' faces because they were not wearing masks. He identified Fillyaw as the man who kicked in the door and Parker as the second man who entered the apartment. Fillyaw carried a shotgun, while Parker had a handgun. Graham stated that the lighting was "okay" and that he did not have difficulty seeing the men. Fillyaw shot Graham in the left shoulder and Parker shot Hughes. Graham did not speak to the shooters or hear them say anything.

¶ 14    As the men started shooting, Graham backed away. Shaw tried to also, but she was shot and fell to the ground. Graham meant to run down the hall, but he ended up in the kitchen and then ran to the back of the apartment because the shooters continued to fire their weapons. Graham remained there until it became quiet and the police arrived. Graham heard a total of 13 to 14 shots.

¶ 15       Graham did not immediately identify defendants as the shooters. He was taken to the hospital, where he spent 3½ weeks and had four or five surgeries on his left shoulder. Graham had just come out of the first surgery and his family was in the hospital room when he spoke to Detectives Giamberduca, Schletz, and Dempsey. Graham was in a lot of pain and on painkillers when he identified defendants, both of whom he knew, from two separate photo arrays. Graham mistakenly identified Earl Epps from a photo array as a third offender, who he later acknowledged was not involved in the shooting.

¶ 16       Little's testimony from the first trial showed that she did not get a good look at the two shooters' faces because they wore masks that revealed only their eyes. She testified that one shooter wore a tannish jacket and fired at someone on the floor with a big black gun. She later identified the jacket that Parker was wearing at the time of his arrest as the jacket worn by one of the shooters.

¶ 17       Rodgers testified at the retrial. She was 15 years old in June 2007 and lived with her mother and sisters in a second-floor apartment across the street from Shaw's building. She acknowledged that at the time of the shooting she had been prescribed Risperdal and other medication for a bipolar disorder and suicidal thoughts but that she was not taking the medications at the time of the offense.

¶ 18       Rodgers testified that at midnight on June 29, 2007, while in a back room, she heard gunshots from Shaw's building. Rodgers told her mother what she heard, but her mother did not believe that it was gunfire, so Rodgers returned to the back room and watched from the window as ambulances arrived. Rodgers testified that she saw two men in black, one with a handgun and the other with a long gun, run toward the alley. One of the men was tall and the other was short. She could not identify them or say whether they had facial hair.

¶ 19       Police officers came to Rodgers's apartment in the morning and asked if she could identify the two men she saw, and she accompanied the officers to the station. Rodgers was shown two different photo arrays. She claimed that the officers did not pressure her to identify anyone. She identified People's Exhibit No. 253 as one of the photo arrays she had been shown and noted that she had placed her initials next to a person's photo. She wrote "land gun" next to the person's photo but meant to write "long gun."

¶ 20       Rodgers identified People's Exhibit No. 254 as the second photo array shown to her and noted that she circled a person's photo and placed her initials next to it. She wrote "handgun" next to this photo because "he's the one I supposed to seen with the handgun."

¶ 21       Before cross-examination in front of Parker's jury, the State sought leave to reopen its direct examination to elicit an in-court identification. The court agreed Rodgers had a "proclivity to change her mind and let's just say testify whimsically" but allowed the State's request. During further direct examination, Rodgers made an in-court identification of Fillyaw as having the long gun and Parker as the short person having the handgun.

¶ 22       Rodgers reiterated that the two men wore black, and she could not see their faces. She stated that the person in People's Exhibit No. 253 was the tall guy and the person in People's Exhibit No. 254 was the short guy. She admitted, however, that in 2009, she had testified that she did not get a good look at the two individuals and also failed to make an in-court identification of either man.

¶ 23    During redirect, Rodgers explained that she was scared when she testified in 2009 because she was a minor. She also stated that she recognized the faces of the people in Exhibits Nos. 253 and 254 as the two men she saw running into the alley.

¶ 24    During recross-examination, Rodgers reiterated that she saw the men's faces. When asked if she had provided contrary testimony, Rodgers replied: "All I could tell you is I seen skin. One was black and one was light skinned."

¶ 25    She explained during redirect that she testified earlier in that manner because she was scared and there's "no telling what can happen." Rodgers could not recall if she told the police on January 13, 2015, that she saw the men's faces. She again denied that the officers told her who to identify. But when asked why she identified defendants, Rodgers stated:

> "First and foremost, when I was 'tooken' [*sic*] to the station, my grandma came down there to get me from the station. My grandma asked the police to stop asking me questions because, first and foremost, they didn't have permission from her. I was a minor.
>
> So they came—still came back to my mama's house and they 'brung' [*sic*] a lineup. Like I told them there at the station, how can I—how can [I] circle people's faces if I have not 'seent' [*sic*] them? But they—they wanted me to do it so I had did [*sic*] it.
>
> And I circled who—they didn't tell me who to circle. I circled who I felt like did it."

A few moments later, Rodgers testified that she did what she "felt" was right.

¶ 26    During further recross, Rodgers again stated that she circled the two photos "because they was [*sic*] in my face and they wanted me to circle them." Rodgers added that she circled the photos because she was tired.

¶ 27    On redirect, Rodgers refused to say defendants were the men she saw running from the scene.

¶ 28    Giamberduca testified that no one forced Rodgers to go with him to the police station. He described Rodgers as conversational, and he denied forcing or threatening her to talk with them. When the interview concluded, Detective Niles called Rodgers's grandmother, and she came to the station and took Rodgers home.

¶ 29    Later that day, Schletz and Giamberduca went to Rodgers's home and showed her two photo arrays. The officers denied forcing their way into her home and claimed she invited them inside. Rodgers and a few small children were home alone. Schletz denied yelling at Rodgers and claimed she voluntarily agreed to look at the arrays. Rodgers said she understood the photo lineup advisory read to her and, after 10 to 15 seconds, pointed to Parker, saying he had the handgun. Schletz then told Rodgers to circle Parker's photo and write her initials, which she did. She also wrote "handgun" next to the photo.

¶ 30    The same procedure was used with Fillyaw's photo. Rodgers examined the array and within 10 to 15 seconds picked Fillyaw's photo from the array, circled it, wrote her initials and the words "land gun." The officers denied forcing Rodgers to make the identifications.

¶ 31    Schletz admitted they did not attempt to locate a parent or guardian before they showed Rodgers the arrays, even though he knew she was a minor. He also stated that Rodgers did not tell them that she was unable to read or write and admitted they did not ask about her use of psychotropic medications. The other detectives already had spoken to Rodgers, believed she was coherent, and Schletz did not observe any behavior to suggest otherwise.

¶ 32 Giamberduca also interviewed Rodgers on January 13, 2015, at 8 p.m. at the Lake County State's Attorney's Office and then he videotaped her interview. Giamberduca identified a redacted copy of the video, and it was received into evidence and played in open court. During the video, Rodgers stated that she had seen the men's faces but was too scared to say this at an earlier hearing. Giamberduca denied any wrongdoing.

¶ 33 The juries found defendants guilty of first degree murder and guilty of the attempted murders of Graham and Hughes. The court denied defendants' posttrial motions. Thereafter, the trial court sentenced Fillyaw to 60 years' imprisonment for Shaw's murder and sentenced Parker to 55 years' imprisonment for Shaw's murder. Both defendants were sentenced to 10 years for each of the two attempted first degree murder convictions of Graham and Hughes, both to be served concurrently with their sentences for first degree murder. Each filed a timely notice of appeal. We combined the appeals for purposes of this opinion.

¶ 34 II. ANALYSIS

¶ 35 A. Sufficiency of the Evidence

¶ 36 We first address Parker's contention that the State failed to establish his guilt of first degree murder and attempted murder beyond a reasonable doubt. Parker's argument rests on what he considers "the severely flawed identification testimony" of the State's two witnesses, Graham and Rodgers, whose testimony he asserts conflicted with the State's other evidence and was internally inconsistent, and whose identifications were made under circumstances that rendered them highly suspect.

¶ 37 As to Graham's flawed identification testimony, Parker notes that Graham's eyewitness account of the shooters was highly questionable because he was under the influence of drugs and quickly ran to a back bedroom where he remained during most of the gunfire. Also, Graham did not identify defendants as the shooters until almost 16 hours after the shooting, when he picked their photographs from separate arrays from his hospital bed while on morphine and in a great deal of pain, having recently had shoulder surgery. Parker further points out the untrustworthiness of Graham's identification by his "on-and-off" again identification of a third offender, Earl Epps. Finally, Parker points out Graham's numerous pending criminal charges also rendering his testimony suspect.

¶ 38 As to what Parker considers Rodgers's flawed identification testimony, Parker points out that she saw two men leave Shaw's apartment building at midnight from a window from her mother's second-floor apartment located across the street. Parker notes that Rodgers admitted that she did not see the men's faces and that she circled defendants' photos on the arrays because the officers wanted her to do so. Parker also points to Rodgers's troubled psychiatric background and her inability to accurately perceive events and her admission at trial that she had not taken her psychotropic medication for at least a month before the shooting.

¶ 39 When a reviewing court reviews the sufficiency of the evidence, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of the evidence or the credibility of witnesses. *People v. Thomas*, 178 Ill. 2d 215, 232 (1997). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and

- 6 -

to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. This same standard of review applies regardless of whether the evidence is direct or circumstantial. *Thomas*, 178 Ill. 2d at 232.

¶ 40 "Circumstantial evidence is the proof of certain facts and circumstances from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind." *Hartness v. Ruzich*, 155 Ill. App. 3d 878, 882 (1987). It is not necessary that each link in the chain of circumstances be proved beyond a reasonable doubt. *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991). Rather, it is sufficient if all the circumstantial evidence taken together satisfies the jury beyond a reasonable doubt of the defendant's guilt. *Id.*

¶ 41 Here, based on our standard of review, a rational jury could have believed the identification of Parker as one of the assailants by both Graham and Rodgers. Their testimony was somewhat corroborated by the discovery of Parker's cell phone near the scene, Little's identification of Parker's jacket, and Graham's statement to the police that Parker wore a "brown hooded sweater with lines on it." See *Fillyaw I*, 409 Ill. App. 3d at 320. The circumstantial evidence of the jacket and the cell phone allowed the jury to infer that Parker was at the scene of the murder and attempted murders, which supports the identification testimony of Graham and Rodgers. See *People v. Grathler*, 368 Ill. App. 3d 802, 808 (2006).

¶ 42                                           B. Graham's Affidavit

¶ 43 Both defendants contend that the trial court erred in refusing their request, pursuant to Illinois Rule of Evidence 806 (eff. Jan. 1, 2011), to impeach Graham's prior testimony with an affidavit which recants his identification of defendants as the shooters. Defendants also argue that the trial court's refusal to admit the affidavit violated their constitutional rights to present a defense and to confront the witnesses against them. Since we turn to constitutional issues only as a last resort, we first address defendants' argument under Rule 806. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort").

¶ 44 The admissibility of evidence normally is in the sound discretion of the trial court. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 36. Therefore, we review a claim of error concerning the admissibility of evidence for an abuse of discretion. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 354, 364 (1991).

¶ 45 Rule 806 provides:

"When a hearsay statement *** has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination." Ill. R. Evid. 806 (eff. Jan. 1, 2011).

¶ 46        Prior to the adoption of the Illinois Rules of Evidence, it was recognized that, where a statement of an absent declarant is properly admitted into evidence under a hearsay exception, "the opposing party may impeach such statement with a prior inconsistent statement by the declarant." *People v. Smith*, 127 Ill. App. 3d 622, 630 (1984) (citing Federal Rule of Evidence 806, which closely tracks the language of Rule 806).

¶ 47        The trial court found Graham to be unavailable, and the court allowed the State to present his testimony from the first trial. As defendants did not contest this unavailability finding, Graham's prior testimony was admissible. See Ill. R. Evid. 804(a)(5), (b)(1) (eff. Jan. 1, 2011). The State had the right to introduce Graham's testimony from defendants' first trial due to his unavailability at the second trial, but defendants had the corresponding right, under Rule 806, to attack Graham's credibility by any evidence which would be admissible if he had testified as a witness.

¶ 48        In his previous testimony, Graham identified both Parker and Fillyaw as the individuals who forcibly entered the apartment and began shooting. Both defendants were tried under an accountability theory. Had Graham testified at the second trial, he certainly could have been impeached with a written statement recanting his earlier identification of defendants by stating that he did not see who shot him.

¶ 49        Before the affidavit would be admitted into evidence, it would be defendants' burden to authenticate it as having been signed by Graham. Illinois Rule of Evidence 901 (eff. Jan. 1, 2011) addresses the need to authenticate a document prior to its admission and provides generally that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Under the rule, and the cases interpreting the rule, defendants need only provide a rational basis upon which the fact finder may conclude that the exhibit was made by Graham. See, *e.g.*, *People v. Downin*, 357 Ill. App. 3d 193, 202-03 (2005) (citing *People v. Munoz*, 70 Ill. App. 3d 76, 88 (1979)). Rule 901(a)(1) is identical to Federal Rule of Evidence 901, the federal rule for authenticating a document, and both tend to be liberally construed favoring admission and subjecting actual authorship to the judgment of a jury. See *Munoz*, 70 Ill. App. 3d at 87-88.

¶ 50        Here, defendant supplied a rational basis upon which the jury could conclude that the affidavit was authored by Graham. Janice Caraballo testified that she was a notary public and that, while she did not recognize the affidavit or have memory of this particular transaction because she had witnessed "so many papers," she did, in fact, state that she notarized the affidavit. She stated that it was her practice for the affiant to show her a state photo identification card or driver's license and to watch the affiant as he or she signed the document; otherwise, she would not have notarized it.

¶ 51        Both the trial court and the State called the exhibit into question because the date of the shooting identified on the affidavit was incorrect. The document states that a shooting took place in North Chicago where a William Fillyaw is identified as purportedly shooting a Lebraun Graham. We find it incomprehensible that the affidavit discusses an incident other than that in question in this case. The affidavit, which reads, in part, states:

> "I Lebraun Graham write this affidavit to say that I never saw who shot me On 7-17-07 truth be told the North Chicago police lead me to believe William fillyaw was the one who shot me."

¶ 52        Parker notes that it is plausible that the July 17, 2007, date did not refer to the date Graham was shot but rather, as the defense argued, to the date when Graham spoke to the police,

particularly where the letter "O" in the word "On" is capitalized, suggesting that the sentence reads: "On 7-17-07, truth be told, the North Chicago police lead me to believe ***." Regardless, the incorrect date would only concern the weight to be afforded the exhibit, not its admissibility. See *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 38.

¶ 53       The State asserts that an "unknown person" provided the affidavit to defense counsel. It appears however that defense counsel identified the individual as Deante White, and the State apparently tried to schedule a meeting with him, but he failed to appear. Nevertheless, White's identity is irrelevant as to whether there is a rational basis for finding the document to be sufficiently authenticated. See *In re Estate of Koziol*, 236 Ill. App. 3d 478, 482-83 (1992) (testimony from notary public who notarized purported will's attestation clause was admissible to prove authenticity of attestation clause and verification of signatures).

¶ 54       A finding of authentication is simply a finding confirming that there is sufficient evidence to justify presenting the offered document to the trier of fact. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51; *People v. Chromik*, 408 Ill. App. 3d 1038, 1046 (2011). Allowing the document to be admitted does not preclude the party opposing its admission from thereafter contesting its authenticity before the jury. *Ziemba*, 2018 IL App (2d) 170048, ¶ 51; *Chromik*, 408 Ill. App. 3d at 1046. Once the document is admitted, the ultimate issue of authorship is left to the trier of fact to determine. *Downin*, 357 Ill. App. 3d at 203.

¶ 55       The State argues that defendants failed to satisfy the elements of admissibility of a hearsay statement of an unavailable witness under sections 115-10.1 and 115-10.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1, 115-10.2 (West 2016)). Defendants, however, correctly note that they never sought admission of the affidavit as substantive evidence under these statutory provisions. Rather, defendants sought admission only to impeach Graham's identification testimony under Rule 806.

¶ 56       No published decision in Illinois has dealt with the admissibility of an affidavit pursuant to Rule 806. A recent decision from the United States Court of Appeals for the Sixth Circuit, *Blackston v. Rapelje*, 780 F.3d 340 (6th Cir. 2015), a case upon which both defendants cite and to which the State has not responded, is instructive here as it illustrates the use of recantations as impeachment material in a second trial.

¶ 57       In *Blackston*, the defendant was tried for first degree murder, and at his first trial, codefendant, Guy Simpson, and the defendant's girlfriend, Darlene Zantello, testified against the defendant. *Id.* at 344-45. After a finding of guilty, the court granted the defendant a new trial on unrelated grounds. *Id.* at 346.

¶ 58       Prior to the second trial, Simpson and Zantello prepared written statements in which they recanted their trial testimony. *Id.* Zantello's affidavit stated that her original (exculpatory) statement to the police was correct and that her trial testimony was untrue. She wrote that she testified falsely because the State agreed to drop criminal charges against her. Simpson prepared a signed but unnotarized statement indicating that his trial testimony was false and that the defendant was not involved in Miller's death. He said he perjured himself because of prosecutorial pressure and fear of another codefendant. *Id.* at 347. During the second trial, both Simpson and Zantello were deemed unavailable and their testimony from the first trial was read to the jury. *Id.* at 346-47. The trial court denied the defendant's request to read their recantations to the jury. *Id.* at 347.

¶ 59       The defendant moved for a new trial, citing Michigan Rule of Evidence 806, a rule virtually identical to ours, which provides that when a hearsay statement is admitted into

evidence the credibility of the declarant may be attacked by any evidence that would be admissible had the declarant testified. *Id.* at 346 n.1. The trial court denied relief, finding that the declarants were manipulating the trial process. *Id.* at 347. The court further found the recantations "unfairly prejudicial" and "suspect" under Michigan Rule of Evidence 403, which allows for the exclusion of relevant evidence where its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *Id.* The Michigan Appellate Court found the trial court had violated the defendant's confrontation rights and reversed and remanded for a new trial. *Id.* The Michigan Supreme Court reversed. *Id.* at 348.

¶ 60  The defendant filed a federal petition for writ of *habeas corpus*. The United States Court of Appeals, Sixth Circuit, held that the confrontation clause was violated. *Id.* It recognized a clearly established right to impeach the credibility of an adverse witness and found that the Michigan Supreme Court unreasonably applied federal law, holding that the recantations were "prototypical impeachment material." *Id.* at 353. The court stated: "A witness's own inconsistent statements, including recantations of prior inculpatory testimony, undeniably bear on a witness's bias and credibility ***." *Id.* (citing *United States v. Hale*, 422 U.S. 171, 176 (1975)). The court found that Simpson's and Zantello's recantations were inconsistent with their prior trial testimony and also explained their motivations for testifying the way they did at the first trial. *Id.* at 354. Because the confrontation clause protections extended to the declarants' prior testimonies, the court found that the trial court had violated the defendant's confrontation rights when it prohibited him from introducing their recantations to impeach their testimony. *Id.* at 352-54. The court further held that the skepticism of the recantations was not a proper basis for exclusion and that the recantations' reliability was a question for the jury to decide. *Id.* at 357 ("mere reliability concerns" do not "trump a defendant's confrontation rights" (citing *Davis v. Alaska*, 415 U.S. 308, 319-20 (1974))).

¶ 61  Like in *Blackston*, the trial court's skepticism of Graham's recantation was not a proper basis to exclude the affidavit. As we conclude that the trial court abused its discretion in denying defendants' motion *in limine* pursuant to Rules 806 and 901, we need not determine the constitutional confrontation clause question.

¶ 62  The State contends that any error was harmless. We disagree. In *Fillyaw* I, we called Graham's testimony into question and noted that Fillyaw was found guilty principally on Graham's testimony that he knew defendants prior to the shooting and recognized defendants at the crime scene. *Fillyaw I*, 409 Ill. App. 3d at 315-16. Little did not testify at the second trial and her testimony from the first trial was read to the jury. However, she never identified defendants as the offenders; she testified that she could only see their eyes. No motive was presented for the attack. Nor did the State present any physical evidence tying defendants to the offenses; no latent fingerprints or guns were recovered. Parker's cell phone was found in the alley by the victim's apartment, but Parker lived about two blocks away. A tan jacket was taken from Parker, but no gunshot residue was detected on either cuff of the jacket. In *Fillyaw I*, we also called into question Rodgers's credibility. *Id.* at 316. Clearly, Rodgers's testimony was problematic at best. At times, she stated she could see defendants' faces and at other times she could "not really" identify them. Rodgers also intimated that she was persuaded to circle defendants' photographs because of police pressure. In short, Rodgers, as the trial court noted, had a "proclivity to change her mind and let's just say testify whimsically."

¶ 63    Graham's identification testimony was of great importance during the trials. In order to accurately assess the credibility of Graham's prior testimony, the jury was entitled to know that subsequent to that testimony, Graham allegedly had signed an affidavit disavowing his identification and attributing the misidentification to improper inducement by the police. The jury had a right to consider the affidavit in judging the value and believability of Graham's testimony. We agree that given the weak circumstantial evidence and the problematic eyewitness accounts, the affidavit's exclusion was "anything but harmless."

¶ 64    Nevertheless, as we previously stated when addressing Parker's insufficiency of the evidence claim, a rational fact finder could find defendants guilty beyond a reasonable doubt based on the evidence presented. Therefore, we find no double jeopardy bar to retrial. If Graham's testimony is used in either case on remand, the affidavit may be admitted as a prior inconsistent statement.

¶ 65                              C. Issues That May Arise on Retrial
¶ 66                              1. Prior Consistent Statements
¶ 67    Fillyaw argued that the trial court erred in admitting Rodgers's prior consistent statements concerning the circumstances of her out-of-court identifications of both defendants. Since this issue is likely to occur on retrial, we will address it briefly. See *People v. Grant*, 2016 IL 119162, ¶ 34.

¶ 68    Detectives Schletz and Giamberduca testified that they showed Rodgers photo arrays of defendants. Rodgers testified on direct examination that the detectives who showed her the arrays did not tell her who to circle on the arrays and that the decision as to who to circle was left to her. On redirect examination, she stated that the police did not tell her what to do during the identification process or who to circle.

¶ 69    Just after the second trial began, on January 13, 2015, Giamberduca recorded an interview with Rodgers at the criminal investigations division. A CD containing excerpts of the interview (People's Exhibit No. 302) was played in open court. In the interview, Giamberduca asked Rodgers whether he "or Detective Schletz back in 2007 ever ask you or ever tell you who to circle." Rodgers answered "No."

¶ 70    Although the trial court seemed to agree with defense counsel that the statement was consistent and was nothing more than bolstering, the court admitted the statements as "substantive evidence to perfect impeachment" pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2014)). Fillyaw maintains that the admission of the State's exhibit was clearly inadmissible as a prior consistent statement and was intended to bolster Rodgers's identical direct examination, while, at the same time, cause the jury to disregard Rodgers's admission that she could not see the facial features of the offenders. We agree.

¶ 71    Statements made before trial are generally inadmissible for the purpose of corroborating trial testimony. *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005). Prior consistent statements are not admissible merely because a witness has been discredited or impeached. *People v. Mullen*, 313 Ill. App. 3d 718, 730 (2000). An exception exists allowing the prior consistent statement admissible to rebut a charge that the witness is motivated to testify falsely or rebut a charge of recent fabrication. *People v. Patterson*, 154 Ill. 2d 414, 453 (1992). The State did not argue that either exception applied. The party seeking to introduce the prior consistent statement has the

burden of establishing that the statement predates the alleged fabrication or predates the motive to testify falsely. *Mullen*, 313 Ill. App. 3d at 730. If a party were allowed to introduce a prior consistent statement whenever there was contradiction of a statement, the exception would swallow the rule. *People v. Miller*, 302 Ill. App. 3d 487, 492 (1998). Here, it was error, as the statements were clearly prior consistent statements that simply reiterated Rodgers's in-court testimony.

¶ 72    The State cites pages and pages of facts only to conclude with a one paragraph analysis that really sheds no light on the issue. The State concedes that the recording "was consistent with some of her testimony," but it argues that it was admissible because it corroborated the officers' testimony. We find no hearsay exception that applies and the State fails to point one out.

¶ 73                                    2. $10 Million Bond

¶ 74    Prior to retrial, the State filed a motion *in limine* to introduce several recorded phone conversations, including one when Parker called Fillyaw from the Lake County jail. Parker already had been arrested and charged in connection with this case and Fillyaw had not been taken into custody yet but a warrant had been issued for his arrest. According to the State's motion, during their conversation both men joked about what transpired at Parker's bond hearing and discussed the facts of the case. The court found that a proper foundation had been laid and ruled the conversation admissible but ordered the redaction of any references to the $10 million bond hearing. The phone call was admitted into evidence and played in open court. The juries heard both Parker and Fillyaw joke about what had transpired at Parker's bond hearing, including that bond had been set at $10 million. The prosecutors highlighted the amount of bond during both their closing and rebuttal arguments. The references to the high amount of Parker's bond were irrelevant and violative of the trial court's order. See *People v. Liner*, 356 Ill. App. 3d 284, 293-94 (2005) (improper to present irrelevant evidence that serves only to show that defendant is a bad person). If this should arise on remand, it is clearly inadmissible.

¶ 75                                    D. Ineffective Assistance

¶ 76    Based on our reversal, we need not address Parker's contention that he received ineffective assistance of counsel.

¶ 77                                    III. CONCLUSION

¶ 78    Based on the preceding, the judgments of the circuit court of Lake County in both cases are reversed and the causes are remanded for further proceedings consistent with this opinion.

¶ 79    Reversed and remanded.