2024 IL App (2d) 220064-U
No. 2-22-0064
Order filed March 18, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 92-CF-239 |
| | ) | |
| STEPHEN E. GRIFFIN, | ) | Honorable |
| | ) | Mark A. Pheanis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We affirm the trial court's denial of the defendant's postconviction petition based on actual innocence after a third-stage hearing where the defendant presented an affidavit recanting an eyewitness' trial testimony and two affidavits that corroborated the recanting affidavit; the trial court's judgment was not manifestly erroneous.

¶ 2   At issue here is whether the trial court's denial of defendant's postconviction petition based on actual innocence after a third stage hearing was manifestly erroneous. Defendant argues that the trial court erred by disregarding the affidavit of an eyewitness who recanted his trial testimony

and the affidavits of two family members who averred that they heard the eyewitness recant. We affirm.

¶ 3                        I. BACKGROUND

¶ 4       In 1994 a jury found defendant guilty of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(a)(1) (now 720 ILCS 5/9-1(a)(1) (West 2022)) by accountability for the shooting death of Michael Brown, and the court sentenced him to 60 years' imprisonment.

¶ 5                        A. Trial Testimony

¶ 6       We summarize the relevant facts appearing in the record. On February 5, 1992, at 9:55 p.m., the body of Michael Brown was found unresponsive and bleeding from the head on the side of Kautz Road. The State charged defendant, codefendant Perez Funches, and Anthony Gibson with the first-degree murder of Brown.

¶ 7       Aurora Police Officer Robert Mangers testified that earlier that day, around 12:30 p.m., he responded to a call of shots fired at defendant's mother's house at 123 Kendall in Aurora. When Mangers arrived at the scene, defendant told Mangers that he was in front of his mother's house when a maroon Mitsubishi drove up slowly. There were three people in the car, and one of the occupants asked defendant if he was "Steve G" and to "stop f***ing with my boy when he comes out here." Defendant told Mangers that he replied, "F*** you," and then one of the occupants pointed a gun at him, so he pulled out a .380 revolver and fired it six or seven times at the car. The car drove to the end of the block, stopped, and the same occupant who pointed the gun at him then fired at defendant approximately three times.

¶ 8       Evidence was introduced that the victim, Brown, ordered the drive-by shooting of defendant's house on February 5. Brown had been selling cocaine in the area. Tommy "Momo" Neal testified that four days earlier, on February 1, he heard defendant and co-defendant Perez

Funches tell Brown "if he did not get them what they wanted, that they was [*sic*] going to beat him up." Defendant then took Brown's gold chain. Defendant and Funches indicated that they wanted "dope, money." Neal also testified that, later, defendant told Brown he knew that Brown was responsible for the drive-by shooting and that "I should shoot you in the back of the head."

¶ 9    Kevin Groom and Brian Adams testified that at about 8:15 to 8:30 on the night of Brown's death they arrived at Pepe's Restaurant on Lake Street in Aurora (Pepe's) to watch a Bulls game. Terry Mishos and Brown were also there. Groom and Mishos testified that Brown made several phone calls from a payphone in the restaurant regarding a coat that Groom believed Neal had stolen from him. Groom testified that, after the phone calls, Brown told Groom that the coat would be there in a few minutes.

¶ 10    Anthony Gibson and Neal testified that, on the night of Brown's death, defendant drove him and Funches to Pepe's Restaurant. Neal added that defendant drove to Pepe's to meet Brown to straighten out who shot at defendant's mother's house and the issue regarding Groom's coat. Neal also stated that defendant parked the car in the Wendy's parking lot that was next to Pepe's parking lot. The parking lots were in the back of the restaurants. Gibson and Neal testified that when they arrived at Pepe's, defendant and Funches exited the car while Gibson and Neal waited in the car. According to Groom, while inside Pepe's, defendant asked Brown to go with him to get the coat. Defendant and Brown then walked outside to the back of the Wendy's. The last time Groom saw defendant was between 9:30 and 9:45 p.m. Mishos saw Brown leave Pepe's with defendant and Gibson between 9:30 and 10:00 p.m. Brown was near defendant's car in the Wendy's parking area.

¶ 11    Neal testified that, while in the Wendy's parking lot, defendant threw Brown to the ground and Funches had his knee in Brown's back and a gun to Brown's head. Then defendant got into

- 3 -

the driver's seat of his car, Gibson got into the passenger seat, and Funches "tossed" Brown in the back seat. Neal and Funches sat on either side of Brown. Funches placed the gun inside a hat and continued to point it at Brown. Defendant asked Brown who "shot up" his mother's house. Defendant told Brown, "I should kill you." Neal identified the gun recovered by the police as the gun he saw Funches point at Brown and identified the hat recovered by the police as the hat Funches used to hide the gun. After leaving Pepe's, defendant stopped the car on the east side of town and ordered Neal out of the car. Defendant and Funches threatened to shoot Neal if Neal told anyone anything he had seen.

¶ 12    Gibson testified that after defendant drove away from Neal, he saw Funches still pointing a gun at Brown and heard defendant tell Brown, "[Y]ou're a dead b***." Gibson asked defendant to drop him at home, but defendant refused. Instead, defendant drove to Kautz Road, which Gibson stated was about fifteen minutes away from Pepe's. Gibson further testified that defendant stopped the car and told Brown, "Get out b***." Brown got out of the car with defendant and Funches, and they moved to the back of the car. Gibson heard a gunshot, turned, and then heard three to four more gunshots. Gibson saw Funches shoot the gun. Defendant and Funches ran back to the car, and Funches stated, "Go man, I just shot somebody for you." Defendant let Gibson out of the car near Gibson's father's house and told Gibson not to say anything.

¶ 13    Aurora Police Officer Greg Thomas testified that on February 9, 1992, he was with two fire department divers who found two pieces of the gun that was used to commit the murder. Defendant led Thomas to the gun that he admitted he had thrown into the river.

¶ 14    Defendant testified on his own behalf as follows. On February 5, 1992, Brown called defendant about a missing coat. At around 9 p.m. defendant called Funches, Gibson, and Neal, and they picked up defendant in his car. Defendant asked Neal about the stolen coat, but Neal denied

that he had the coat. The four men went to Pepe's to talk to Brown about the coat. Defendant parked between Pepe's and Wendy's, and he and Funches entered Pepe's. Defendant spoke to Brown about the coat. Gibson was present during the conversation. Groom came over to defendant and said that it was his coat that was taken. Groom and defendant walked outside, and Groom identified Neal as the person that took his coat. Defendant was at Pepe's for about five minutes. Brown got into defendant's car with defendant, Funches, Gibson, and Neal and they left Pepe's to get the coat. Defendant told Neal to stop lying about the coat, dropped Neal off, and told him to get the coat. Defendant drove to his house, arriving there "after 9:30." He let Funches, Gibson, and Brown take his car. Defendant then drove to Paula Thomas' house in Betty's car.

¶ 15     Defendant testified that the day after the incident, Funches gave him a gun inside a hat and told him the gun had been used to kill Brown. Defendant threw the gun over the Indian Trail bridge and later led an officer to the area where the gun was recovered.

¶ 16     During cross-examination, defendant testified that he told officers James Brummett and Davis that he last saw Brown at about 6:30 p.m. when he left Pepe's, and that Brown never got into defendant's car. Defendant also told Officer Anderson that Brown was still at Pepe's when defendant left there. Defendant denied that he told Anderson he was at his girlfriend Paula Thomas' house at 9:15 p.m., but then admitted that he told Anderson that he was at Paula's house at that time. Defendant's cousin, Betty Williams, was at his mother's house. Defendant stated that he changed his alibi after the police told him that witnesses placed him at Wendy's with Brown at 9:45 p.m. and saw Brown depart in defendant's car. Defendant then admitted that he actually left Pepe's with Funches, Gibson, Neal, and Brown, and that he dropped Neal off. Defendant testified that he was dropped off at his mom's house before the murder was committed. Defendant told the

police that he watched as Funches and Gibson fought with Brown, and then as Funches and Brown left in the car.

¶ 17 Betty Williams testified that on the night of the incident, she saw defendant at his mother's house at about 9:40 p.m. Williams drove defendant to Paula Thomas' house.

¶ 18 In rebuttal, Aurora Police Officer James Brummett testified that he interviewed defendant on February 7, 1992, at 8:10 a.m. Defendant told Brummett that he last saw Brown at Pepe's at 6:30 p.m.

¶ 19 Aurora Police Officer Gregory Anderson testified that he interviewed defendant on February 7, 1992, at 9:50 p.m. Defendant told Anderson that he left Pepe's with Funches, Gibson, and Neal, and that he was at Thomas' house by 9:15 p.m. Defendant also told Anderson that Brown stayed at Pepe's.

¶ 20 During closing argument, the State argued that defendant was guilty of first-degree murder on accountability. The jury was instructed regarding accountability. The jury found defendant guilty of first degree murder, and the trial court, Judge James T. Doyle presiding, sentenced defendant to 60 years' imprisonment.

¶ 21 B. Posttrial Proceedings

¶ 22 On direct appeal we affirmed defendant's conviction and sentence. *People v. Griffin*, 2-95-1249 (1997) (unpublished order under Illinois Supreme Court Rule 23), and our supreme court denied leave to appeal (*People v. Griffin*, 176 Ill. 2d 582 (1998) (table)).

¶ 23 In his post-conviction petition, defendant alleged: (1) that the State suborned perjury by Gibson and Neal in their trial testimony, especially regarding what they received in return for their testimony; (2) ineffective assistance of counsel for (a) failure to offer in evidence telephone records to impeach Gibson and (b) failure to poll the jury and to tell the court that two jurors later

told counsel that they did not believe that defendant was guilty but the jury room was too cold, and they did not want to stay overnight because of an upcoming holiday weekend; and (3) that the State withheld exculpatory evidence. Defendant attached a February 17, 1992, unsworn handwritten "voluntary statement" from Funches, who had not testified at defendant's trial, in which Funches stated that he would testify that defendant was not present at Brown's killing, had no knowledge of it, and was not involved in the planning or ordering of it. Defendant also filed a motion for an evidentiary hearing and appointment of counsel. The trial court, Judge James T. Doyle presiding, found the petition to be "without merit and patently frivolous" and dismissed it.

¶ 24     In March 1999, defendant filed a "first amended" petition for postconviction relief. Defendant made the same allegations he made in his original petition but attached affidavits of his sister and mother regarding (1) conversations that they had with defendant's trial attorney about the two jurors who did not believe that defendant was guilty, and (2) a conversation with Gibson in which Gibson stated that defendant had nothing to do with the murder and that the State had paid both himself and Neal for their trial testimony. None of the attachments to his 1998 petition were attached to the first amended petition. Another copy of the first amended petition was file-stamped April 14, 1999, but did not include the affidavit of defendant's sister.

¶ 25     On July 9, 1999, defendant filed a second amended petition for postconviction relief, noting his prior allegations and raising "newly discovered evidence" in the form of an attached affidavit of Gibson in which Gibson averred, "some of the testimony I gave at trial was false. *** I committed perjury in giving this false testimony after I was arrested and decided to completely exonerate myself and cooperate with the police and State's Attorney, by saying what they wanted me to say. *** [Defendant] was not present when [Brown] was shot." The trial court appointed the public defender to represent defendant.

¶ 26    After years of continuances and discovery, in 2008 defendant filed a third amended petition (petition) alleging, *inter alia*, the claim that Gibson had recanted his testimony. In addition to Gibson's affidavit, defendant attached the affidavits of Dillar and Gloria Griffin, wherein they averred that Gibson told them that he lied at trial and that the prosecutor paid Gibson for his testimony. Gloria added that Gibson offered to come forward with "the truth" if he was paid $5000. The State filed a motion to dismiss.

¶ 27    In 2009, the trial court, Judge Timothy Q. Sheldon presiding, determined that it would "give effect" to the court order from 1998 that summarily dismissed the petition, and that defendant could appeal that dismissal. On appeal, we reversed the trial court's judgment and remanded "for the State to expeditiously and timely file an answer to defendant's third amended petition and for further appropriate and timely proceedings on the petition." *People v. Griffin*, 2013 IL App. (2d) 110631, ¶ 32-33.

¶ 28    In October 2013, the State filed its answer to defendant's petition. In September 2017 defendant filed his response. In July 2019 the trial court, Judge Mark A. Pheanis presiding, ordered the matter set for a third stage evidentiary hearing. In October 2021, the trial court issued a writ of *habeas corpus* to secure the presence of Gibson—who was being held in the Du Page County Jail—for the evidentiary hearing.

¶ 29    On October 25, 2021, at the evidentiary hearing, neither party presented any witnesses. Defendant presented the affidavits that were attached to his third amended petition. The trial court admitted the affidavits.

¶ 30    Following the evidentiary hearing, the trial court denied defendant's postconviction petition. The court found defendant failed to meet his burden to prove his actual innocence by a preponderance of the evidence. The court noted that defendant's claim was based on the two

inadmissible hearsay affidavits of defendant's mother and sister and the terse recantation affidavit of Gibson. The court gave little weight to Gibson's affidavit because Gibson did not testify as a witness at the hearing under oath and was, therefore, was not subject to cross-examination, and did not allow the court to assess Gibson's credibility. The court also found that Gibson's recantation would not affect the outcome on retrial because it was contradicted by Gibson's "detailed and lengthy trial testimony." In addition, Gibson's recantation contradicted the trial testimony of "multiple witnesses who placed [defendant] and [Brown] together in [defendant's] car."

¶ 31   Defendant timely appealed.

¶ 32                    II. ANALYSIS

¶ 33   The Post-Conviction Hearing Act provides a three-stage procedure by which a criminal defendant can assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1 *et seq.* (West 2022). At the first stage, the circuit court has 90 days to review a petition and may summarily dismiss it if the court finds it is frivolous and patently without merit. *Id.* § 22-2.1(a)(2). If the petition is not dismissed within that 90-day period, the circuit court must docket it for further consideration. *Id.* § 122-2.1(b). At the second stage of postconviction proceedings, counsel may be appointed for defendant, if defendant is indigent. *Id.* § 122-4. After counsel has made any necessary amendments to the petition, the State may move to dismiss a petition or an amended petition pending before the court. *Id.* § 122-5. If that motion is denied, or if no motion to dismiss is filed, the State must answer the petition, and, barring the allowance of further pleadings by the court, the proceeding then advances to the third stage, a hearing wherein the defendant may present evidence in support of the petition. *Id.* § 122-6.

¶ 34    At a third-stage hearing, the defendant bears the burden of showing a deprivation of his constitutional rights by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. The trial court serves as the fact finder and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. See *People v. English*, 2013 IL 112890, ¶ 23. Thus, we will not reverse the court's denial of a postconviction petition following an evidentiary hearing unless the denial was manifestly erroneous. *People v. Eubanks*, 2021 IL 126271, ¶ 47. A decision is manifestly erroneous only if it contains error that is clearly evident, plain, and indisputable. *Id.* At the evidentiary hearing, the defendant bears the burden of making a substantial showing of a deprivation of a constitutional right. *Id.* ¶ 29.

¶ 35    Here, defendant appeals only the denial of his petition regarding his claim of actual innocence. The due process clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2) affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence. *People v. Prante*, 2023 IL 127241, ¶ 73 (citing *People v. Washington*, 171 Ill. 2d 475 (1996)). Evidence in support of a claim of actual innocence must be (1) newly discovered, (2) not discoverable earlier through the exercise of due diligence, (3) material and not merely cumulative, and (4) of such conclusive character that, when considered along with the evidence that was presented at trial, the new evidence would probably change the result on retrial. *Id.* ¶ 73.

¶ 36    To be newly discovered evidence means evidence that was discovered after trial and that the defendant could not have discovered earlier through the exercise of due diligence. *People v. Jackson*, 2021 IL 124818, ¶ 42. Evidence is material if it is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is noncumulative if it adds to

the information that the fact finder heard at trial. *Id.* Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result on retrial. *Id.* The conclusive character of the new evidence is the most important element of an actual innocence claim. *Id.*

¶ 37    On appeal, here, the parties dispute only the conclusive character of the new evidence, the three affidavits. Defendant maintains that the affidavits of Gibson, Dillar, and Gloria Griffin are of such conclusive character that it would likely change the result on retrial.

¶ 38    The purpose of the third stage evidentiary hearing in this case was to determine whether the affidavits were of such conclusive character that it would probably change the result on retrial. Our supreme court has described the role of the trial court as follows: "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34; see also *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1036 (2011) ("Credibility determinations such as this [at a third-stage evidentiary hearing] are properly made by the trier of fact, and we have no basis in the record for second-guessing the trial court's judgment."). "This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Coleman*, 2013 IL 113307, ¶ 97. Because the affiants did not testify at the hearing, the trial court was required to assess the credibility of the affidavits. We examine each affidavit in turn.

¶ 39    Regarding Gibson's affidavit we note that a witness's recantation of his prior testimony is viewed as inherently unreliable (*People v. Morgan*, 212 Ill. 2d 148, 155 (2005)), particularly where the recantation involves a confession of perjury (*People v. Steidl*, 142 Ill. 2d 204, 254 (1991)). A court should not grant a new trial on the basis of a witness's recantation except in extraordinary

circumstances. *Morgan*, 212 Ill. 2d at 155. Gibson's affidavit stated that some of his trial testimony was false and that defendant was not present when Brown was shot. However, the recantation affidavit offered in this case was not so extraordinary as to overcome the inherent lack of reliability attached to such statements. See *Morgan*, 212 Ill. 2d at 155; *Steidl*, 177 Ill. 2d at 260; *People v. Jones*, 2012 IL App (1st) 093180, ¶ 63.

¶ 40 Gibson's affidavit lacked detail about who participated in the offense, how the offense occurred, or when defendant allegedly withdrew from the scene. Gibson also failed to explain when and why he decided to recant.

¶ 41 Further, Gibson's affidavit that defendant was not present during the shooting was contradicted by evidence presented at trial. The record establishes that defendant was with Brown shortly before Brown was shot. Neal testified at trial that just prior to Brown's murder, defendant threw Brown to the ground in the Wendy's parking lot. Then, while in defendant's car, Funches held a gun to Brown's head while defendant drove, and defendant asked Brown who "shot up" his mother's house. Then, defendant told Brown, "I should kill you." A few minutes later, defendant ordered Neal out of his car and threatened to shoot Neal if he said anything. Shortly thereafter, Brown's body was found on Kautz Road. Defendant led the police to the murder weapon where he had disposed of it. Further, the record establishes that defendant blamed Brown for the shooting at his mother's house the day of the shooting and threatened to kill Brown. Neal testified that defendant knew Brown was responsible for the shooting of his mother's house and threatened Brown that he "should shoot [Brown] in the head."

¶ 42 We also note that because Gibson did not testify at the evidentiary hearing, his terse averments contained in his affidavit were not subject to cross-examination. Recantation evidence bears on a witness's credibility. *People v Fillyaw*, 2018 IL App (2d) 150709, ¶ 60. The trial court,

as finder of fact, considers and determines the credibility of the witnesses, including the circumstances and weight to be accorded their testimony. *Steidl*, 142 Ill. 2d 204, 253-55 (in determining the weight to be given a witness's recanting testimony, the finder of fact can consider the conditions and circumstances under which the recantation was obtained). Here, Gibson failed to testify, thereby denying the trial court the opportunity to consider his credibility, probe him with questions, and observe him during cross-examination. Therefore, in light of the trial evidence and the vague nature of Gibson's affidavit we cannot say that the trial court committed manifest error in finding that Gibson's affidavit was unreliable.

¶ 43     Defendant also argues that Gibson's recantation was corroborated by the affidavits of Dillar and Gloria Griffin wherein they averred that Gibson told them that he lied at defendant's trial and that defendant was not involved in Brown's murder. The State argues that the trial court properly disregarded these affidavits because they contained hearsay and would not be admissible at a new trial. Hearsay affidavits are admissible in postconviction hearings under Illinois Rule of Evidence 1101(b)(3) (eff. Sept. 17, 2019). Such affidavits must be taken as true at a second stage postconviction hearing in determining whether to advance the petition to a third-stage evidentiary hearing. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 119. However, when, as here, the petition advances to a third stage evidentiary hearing, a defendant "no longer enjoys the presumption that the allegations in his petition and accompanying affidavits are true." *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 13. Instead, at a third stage hearing, the court decides the weight to be given the testimony and evidence, makes credibility determinations, and resolves any evidentiary conflicts. *Velasco*, 2018 IL App (1st) 161683, ¶ 118. In determining the weight to be given the new evidence and whether all the evidence, new and old, is of such conclusive character that it would likely change the result on retrial, the court at the third stage must necessarily consider

whether the new evidence would ultimately be admissible at a retrial. *Id.* Here, at the third stage, the hearsay affidavits of Dillar and Gloria Griffin were subjected to credibility, reliability, and weight-testing. The trial court properly weighed the hearsay affidavits and considered the possibility of their admissibility at a new trial.

¶ 44    Next, defendant contends that the trial court's rejection of the affidavits was improper because the State presented no witnesses or evidence to refute them. Defendant fails to recognize that it was *his* burden to show a substantial violation of a constitutional violation by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92. Therefore, the State did not need to present any witness or evidence.

¶ 45    We hold that the affidavits at issue were not so conclusive that their admission on retrial would likely result in a different outcome. *Id.* ¶ 84. In sum, defendant failed to demonstrate manifest error where the trial court's decision was based on the evidence, was not arbitrary, and was reasonable. *People v. Jones*, 2012 IL App (1st) 093180, ¶ 49. We, therefore, determine that the trial court properly dismissed defendant's postconviction petition alleging his actual innocence based on newly discovered evidence following a third stage evidentiary hearing.

¶ 46                                III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 48    Affirmed.