NOTICE

Decision filed 10/27/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180493-U

NO. 5-18-0493

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 16-CF-475 |
| | ) | |
| BRIAN PHEASANT, | ) | Honorable |
| | ) | Thomas J. Tedeschi, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant's conviction for first degree murder is affirmed where the trial court did not abuse its discretion in admitting evidence, where the prosecutor did not commit misconduct during closing arguments, and where no error occurred when the jury was allowed to view evidence during deliberations.

¶ 2   This is a direct appeal from the circuit court of Franklin County. The defendant, Brian Pheasant, was convicted of first degree murder. On September 18, 2018, he was sentenced to an enhanced term of 67 years' imprisonment followed by 3 years of mandatory supervised release (MSR). The defendant raises three points on appeal: (1) that the trial court abused its discretion in admitting evidence, (2) that the prosecutor

1

committed misconduct during closing arguments, and (3) that structural error resulted from the jury viewing evidence during deliberations. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On November 18, 2016, the defendant was charged by indictment with two counts of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2016)). It was alleged that on or about October 31, 2016, the defendant shot his wife, Beth Pheasant, at their home in Christopher, Illinois. The indictment further alleged that the State would seek a sentencing enhancement based on the fact that the defendant personally discharged a firearm (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)).

¶ 5     Prior to trial, the defendant filed a motion to suppress part of his statement to the police. A video of his interrogation showed that 25 minutes into the interrogation, he said that he did not want to talk anymore, and despite this statement, the officer continued to question him. The trial court ruled the statement inadmissible from that point forward.

¶ 6     Also prior to trial, the defendant filed a motion to bar the State from using a video found on the defendant's cell phone as evidence. In the video, which had a modified date of October 26, 2016, the defendant is seen lip-syncing part of the Johnny Cash song, "Cocaine Blues." As he sings that he "took a shot of cocaine and I shot my woman down," he makes a shooting motion with his hand. Defense counsel argued that the original video was older than the State claimed, and that the evidence included a second older copy of the video. The trial court denied the motion.

¶ 7     On May 8, 2018, the defendant's three-week jury trial commenced. The evidence indicated that the defendant and the victim had been together for 10 years and married for

2

7 or 8 years prior to the victim's death. They each had children from prior relationships. In October 2016, the victim began an affair with her son's jiu-jitsu teacher, Sam Burns. The defendant learned about the affair roughly a week before the victim's death when he followed her phone's GPS signal to Burns's house. When the victim came out of Burns's house, she told the defendant that she had not wanted him to find out that way, and that she wanted a divorce. Burns testified that the defendant came by his house two times. The second time, Burns and the victim were outside and interacted with the defendant. Burns recalled that the defendant said the victim had cheated on him before, and he made "some insulting comments."

¶ 8 The victim's coworkers testified that in the week before her death, the victim was upset, tearful, frustrated, and "not herself." Stacey Stricklin testified that the defendant came to the victim's workplace to see her the Tuesday before she died. When Stricklin said "this was not the time *** [or] the place," the defendant left without getting angry or saying anything. Andy Heibner testified that a few days later, he heard a man on the victim's phone yelling at her. Heibner could not hear what was being said and could not identify the voice.

¶ 9 The victim's oldest daughter, Makaylah, testified that the defendant and the victim told the family they would be divorcing. The day after they announced the divorce, the defendant indicated that the victim was having an affair.

¶ 10 On October 27, 2016, the defendant went to Hood's Gun Shop and bought a Springfield Armory 9-millimeter semiautomatic pistol, which he said he wanted for concealed carry purposes. According to the shop owner, James Hood, the defendant had

3

a pleasant demeanor, did not talk about any difficulties he was experiencing in life, and appeared to know "somewhat" about how to use a gun. The defendant put down a deposit on the gun, with plans to pick it up after the waiting period. The defendant's friend, Anthony Neikes, testified that the defendant and the victim had talked about buying a gun for a long time and were always debating which gun to buy.

¶ 11 The defendant returned to Hood's shop on October 31, 2016, to pick up the gun, and, according to Hood, he seemed "perfectly fine." Hood went over the gun with him, disassembled it, and explained how to clean it. Surveillance video of this interaction was shown at trial. Hood narrated that video, explaining that it showed him and the defendant discussing the proper way to load and chamber the gun. Hood told the defendant to shoot cheap ammunition through the gun first, as new guns sometimes require a break-in procedure. Hood would tell his customers to shoot 100 to 150 rounds to make sure they were familiar with their gun and that it would function properly before they carried it.

¶ 12 Hood further testified that the particular gun the defendant bought had a "little hiccup" with it. Specifically, he testified:

> "When you shoot it, it normally happened on the first or second magazine, but the gun is—it's manufactured so tightly that the slide wouldn't go completely all the way forward.
>     You might shoot four or five rounds and then go to pull the trigger and nothing happen[s]. But it is slightly out of battery, so you push it just a little bit forward and it will continue to fire. And that's really about the only issue we have ever had with those."

¶ 13 Neikes testified that he and the defendant were hanging out on the evening of October 31, 2016. They had at least one beer at Neikes's house, then went to two different bars at which they did not have any beer because they did not see anyone they

4

knew.  At a third bar, they each bought a round of beer.  They talked throughout the day, and the defendant was upset about his divorce.  The defendant had found a house to move into where his son would be able to stay over.  Neikes testified that it seemed like the defendant and the victim were getting everything figured out.  They went to a fourth bar for another drink and to throw some darts, then went to Burger King.  They had planned to meet some friends at a different bar in Whittington, but when they arrived at that bar, the defendant did not get out of the car.  Neikes went in and used the restroom, then they headed back to Christopher.

¶ 14    The defendant had been using his cell phone throughout the evening, but it got wet at some point, so he had to use Neikes's phone to make calls.  He called his daughter and one of his friends.  Later in the evening, the defendant called the victim.  Neikes was trying to keep the defendant from doing so because he was upset, though Neikes emphasized that the defendant was not angry.  When Neikes returned to the car after stopping in Whittington to use the restroom, the victim's name was on his phone as if the defendant had called her.  They drove back to Neikes's house, where the defendant had parked his truck.  The defendant suggested going to the Italian Club, so he got into his truck and Neikes followed him in his car.  They planned to drop the defendant's truck off at the defendant's house before heading to the club.

¶ 15    At the defendant's house, Neikes recalled that the defendant got out of the truck, said he would be out in a moment, and went into the house.  From where Neikes was parked, he could see through a window into part of the kitchen.  As he waited, Neikes heard arguing.  The defendant was holding a phone, and the victim was yelling, "Give me

5

my phone back." Once they stepped away from the kitchen window area, Neikes could no longer see them.

¶ 16   Neikes heard the first gunshot about 20 seconds after the victim and the defendant disappeared from his line of sight. He got out of his car at that point. About three seconds after the first shot, he heard a second shot, at which point he began to run toward the house. He entered through the garage and saw blood in the hallway leading from the garage into the house. Neikes ran past the victim's son Riley's room, which was to the right of the hallway, and around the corner, where he saw the victim lying face down in the kitchen. Neikes gave his phone to Riley, told him to call 9-1-1, and returned to the victim.

¶ 17   According to Neikes, the defendant came from the other side of the house, where his bedroom was located, holding the gun. Neikes ran to grab Riley and dragged him out of the house. He put Riley in his car and drove away while talking to 9-1-1. The 9-1-1 dispatcher told Neikes to return to the house, so he did.

¶ 18   The victim's daughter, Shelby, testified that she was home with her brother and the victim on the evening of October 31, 2016, when the defendant arrived. She was in her room when she heard the victim saying she wanted her phone back and needed to get to work. Shelby went into the kitchen, where she saw the defendant walking toward the garage. The defendant was holding the phone above his head and scrolling through it. Shelby testified that the victim looked at her and said to call 9-1-1. She waited until the victim started walking to the garage, and then she went to get her phone from her room.

¶ 19    As Shelby got past the kitchen, she heard a loud bang. She initially believed this sound was the phone falling. However, the victim yelled, "Call 911. Brian shot me." Shelby ran back to the stairs leading to the garage and saw the victim holding her side, struggling to walk, and holding her hand against the wall for support. Shelby ran to her room to get her phone and call 9-1-1. She then went into the backyard.

¶ 20    Riley testified similarly that he was home with Shelby and the victim when the defendant and Neikes arrived. He heard arguing and knew that the defendant had been drinking. Riley heard the defendant and the victim come down the stairs, still arguing. Shelby yelled, "Don't touch her," and the defendant said, "Don't touch me." The victim said, "Give me my phone back." Riley then heard the defendant yelling something followed by a loud pop. He also thought the sound was the defendant throwing the victim's phone to the ground. Riley heard a second pop and someone running. He grabbed a knife and an airsoft gun to protect himself. When he opened his bedroom door, he saw blood on the ground and Neikes coming into the house. Neikes gave Riley his phone and told him to call 9-1-1. Neikes went up the stairs for approximately 30 seconds, then returned to Riley and said they needed to go.

¶ 21    At trial, the State presented the 9-1-1 calls from Shelby and Neikes. The State presented testimony and body camera footage from the responding officers as well as testimony from the paramedics who arrived at the scene.

¶ 22    Illinois State Police (ISP) trooper Jason Colp interviewed the defendant while he was in custody at the Christopher Police Department. After the defendant received *Miranda* warnings, he told Colp that he planned to commit suicide. As part of his plan,

7

he bought a gun and wrote letters to his family. He had not planned for the suicide to occur that night, but he had a bad night arguing with the victim, and he received a call from his second ex-wife that she was moving with his son. He felt like everything was coming down on him at once.

¶ 23 The defendant said he was in the house that night and was going to tell the victim about the letters. He was planning to wait until she got in the garage, where he would kill himself. They were in the kitchen and her phone lit up. He picked it up, and she grabbed him to get it back. At that point, Shelby came into the room. The defendant kept walking toward the garage, as he did not want to do anything with Shelby there. When they got to the garage, the victim told Shelby to call the police, and Shelby left.

¶ 24 The victim continued to clutch at the defendant for her phone. The defendant, who had the gun stuffed in his waistband, put the gun to his head and pulled the trigger, but nothing happened. The gun jammed, with the slide hanging up. He pulled the gun down and kind of "messed" with it, at which point the gun went off and hit the victim. The victim had already started walking back into the house when she saw the gun. He heard her tell Shelby that he shot her. The defendant was in shock, explaining that shooting her was the last thing he had wanted to do.

¶ 25 In his statement to Colp, the defendant said that he again tried to shoot himself, but the same problem occurred. He said the gun dropped a bullet out, and he tried to shove bullets back in. He followed the victim into the kitchen, again trying to fix the gun and pulling the trigger multiple times. The gun went off again, and the victim fell to the ground. The defendant was horrified and went into the bathroom, where he again tried to

8

fix the gun. When he eventually got it fixed, he walked back to the kitchen to look at the victim. He sat down by the washing machine to kill himself, but he could not do it, and commented that he should have.

¶ 26 The defendant told Colp that he did not know he was pulling the trigger in the garage as he racked the slide. Instead, he said he was racking the slide and squeezing it. He was not looking at the victim, who was walking back into the house, when he was messing with the gun in the kitchen. Consistent with the trial court's pretrial suppression order, the interview ended; the last interaction on the video was of the defendant crying and Colp telling him to take his time.

¶ 27 The State presented crime scene evidence and testimony from ISP crime scene investigator Tammy Turner. Turner's photographs included the victim lying on the floor of the kitchen; five live rounds found in the living room, hallway, and garage; blood in the hallway, kitchen, and stairway; the defendant's firearm and cell phone in the kitchen; and the victim's cell phone in the garage. Turner also testified to obtaining DNA standards from Neikes and the defendant, as well as a gunshot residue (GSR) kit from the defendant. She further identified the defendant's firearm along with two fired projectiles—one found in the garage and one found on the living room rug. She also identified the shell casings that were recovered by the police.

¶ 28 GSR testing, which was performed on the victim's hands postmortem, revealed the presence of GSR on her right hand. No GSR was found on the defendant's hands. Fingerprint analysis of the gun's magazine matched the defendant. The gun's trigger, grip, and slide were swabbed with a single swab, which revealed a mix of at least two

9

DNA profiles. The major profile was consistent with the defendant, and the minor profile was incomplete and unsuitable for comparison. Scientific testing of the blood swabs taken from the house showed that the blood was consistent with the victim.

¶ 29 A search of the defendant's truck yielded the letters to his children and the victim as well as two boxes of ammunition. One of the boxes was full, while the other had 11 empty slots.

¶ 30 Forensic pathologist Dr. John Heidingsfelder testified as to the victim's autopsy and identified photographs from the procedure. The victim first sustained a gunshot wound to the back of her right shoulder that exited the left side of her chest after hitting the right atrium of her heart and the right upper lobe of her right lung, as well as grazing her left lung. She also sustained a gunshot wound to the right side of the back of her head; that bullet exited through her mouth after hitting her brain, the petrous ridge bone at the base of her skull, and the back of her throat. The first wound would have been fatal if she did not receive medical attention within five minutes, while the second wound would have been immediately fatal. Dr. Heidingsfelder listed the cause of the victim's death as "cerebral disruption or disruption of brain tissue due to gunshot wounds to her head and chest." He classified the death as a homicide, which meant "the killing of one person by another person" and was not a conclusion as to whether the shooting was accidental or not. However, Dr. Heidingsfelder opined that the victim's death did not appear to be accidental because it involved two gunshot wounds. Her toxicology screen revealed a toxic dose of a diet pill and an "above therapeutic" level of an antidepressant.

¶ 31 Franklin County coroner Marty Leffler testified that he arranged for the autopsy. The victim's death certificate listed the cause of death as "Cerebral disruption due to a gunshot wound to the brain and lung," and the manner of death as homicide.

¶ 32 The State presented evidence of a video retrieved from the defendant's cell phone. In the video, the defendant is depicted singing along to a portion of a Johnny Cash song entitled "Cocaine Blues," stating that he "took a shot of cocaine and I shot my woman down." The video had a "created and/or modified" date and time of October 26, 2016, at 8:47 p.m. The defendant's cell phone contained another copy of the same video, but with the date of May 5, 2015; ISP trooper Timothy McDaniel, who obtained the video, agreed that it was fair to say that the defendant made the video in May 2015 and downloaded it again in October 2016. The cell phone dump taken from the defendant's phone included 14 other videos with the same date of October 26, 2016. The exhibit indicated that those videos were modified within seconds of each other on that date.

¶ 33 The State also presented records of the defendant's text messages and calls, including those made to the victim, dating back to October 25, 2016. Those messages reflected that the victim sometimes indicated she was receptive to trying to save their relationship and at other times told him not to text her. Their messages also referred to dividing up their assets and separating their accounts. On October 28, the defendant sent the victim a message apologizing for disrespecting her and indicating that she was special to him. She accepted his apology and indicated that she hoped they could remain in each other's lives. Two days later, she said that she was willing to see a counselor and would call one on Monday, though she expressed doubt that they would be able to fix their

11

relationship. Later that day, he texted her that he would not join the family at Six Flags theme park and said not to contact him unless it was absolutely necessary.

¶ 34 The text messages showed continued and escalating anger from the defendant on October 31, 2016. In the evening, the victim wrote she was going to take a nap and put her phone on do not disturb. The defendant continued to call and text the victim even though she had stopped responding regularly to his messages. He texted her around 10 p.m. asking for a ride, but when she said she had to be at work in an hour, he responded that he did not know she worked that night. The defendant asked why she blocked him and why her phone was going to voicemail.

¶ 35 Two experts testified as to their examination of the defendant's firearm. ISP forensic scientist Tom Gamboe, a firearms identification expert, examined the gun and fired test shots as well. As part of his analysis, he checked the gun's serial number because Springfield Armory had recalled some similarly designed pistols. The defendant's gun was manufactured after and was not part of the recall. Gamboe also looked at the two fired bullets, as well as the five live rounds recovered from the house. According to Gamboe, the live rounds had no identifiable toolmarks on them.

¶ 36 As part of his analysis, Gamboe said, he fired the gun with both the submitted ammunition found in the defendant's truck and the laboratory's test ammunition; in total, he fired the gun 18 times without incident. Additionally, Gamboe tried 96 times to get the gun to malfunction accidentally, but the gun only fired when used as designed. It never fired without the trigger being depressed.

¶ 37    Gamboe agreed that he had fired at least 3000 guns in his lifetime and admitted that he had previously fired a gun accidentally.  Any number of things could cause an unfired bullet to get stuck halfway in or out of a gun, such as: a magazine not being inserted all the way, the shooter lacking an adequate grip on the pistol such that the slide does not come far enough back to chamber the cartridge, the shooter holding the slide, or low powder in the first fired shot causing the slide not to come back far enough.  If a gun had a light primer strike, that could cause it to not fire.  However, the live rounds Gamboe examined in this case did not appear to have any light primer strikes.  Gamboe also testified that one way to address improper chambering of a gun was to hit the gun to force the slide closed.  A gun might not properly chamber if the chamber contained debris, but Gamboe did not notice any debris problems with the defendant's firearm.

¶ 38    David Williams, the head of research and development at Springfield Armory, testified that the gun in this case was manufactured in Croatia, where the post-recall design took place, about three years after the recall and redesign.  Williams testified that the post-recall design eliminated the possibility of the recall circumstance—multiple firings when you pressed the trigger—from happening again.  According to Williams, Springfield Armory only observed two guns demonstrate the recall circumstance and one was still under investigation, though 250,000 guns were subject to the recall.  In the post-recall group, four firearms had been returned to Springfield Armory for warranty repairs, including one for a light primer strike and one for a stuck magazine.

¶ 39    Williams explained that if a gun's operator does not operate it correctly, for instance, if the operator does not pull the slide all the way back, the gun probably would

13

not load. He estimated that there were probably a dozen different ways that a bullet could get caught in a gun's breech and pop out of the breech without being fired. For example, that could happen if the operator put the cartridge in the magazine backward; in that case, the cartridge would jam the mechanism or fall on the floor. If the operator put a cartridge in the magazine and retracted the slide but did not release the slide to let it drive home, the slide might not close completely, leading the cartridge to bounce or come out of the magazine. He agreed, though, that there were no reported problems with the post-recall redesign of the gun.

¶ 40 The defendant testified and presented evidence in his defense. His second ex-wife, Trisha Veach, testified that during their divorce in 2008, the defendant attempted to kill himself. She believed that the end of their relationship "crushe[d]" the defendant and made him "feel hollow." Veach was aware that the defendant made the lip-syncing videos and had seen some of them on his Facebook page. A few days before October 31, the defendant's son told Veach about the defendant's situation and that the defendant was upset and inconsolable. Veach contacted the defendant and said that he needed to pick himself up and move on for the kids, but he seemed very down. On October 31, Veach contacted the defendant again to let him know that she was getting remarried and moving to Marion. The defendant was very upset because he felt like Veach was trying to take his son from him, which was not her intent. She wanted their son to spend more time with the defendant because of what he was going through.

¶ 41 The defendant's son, Drew, testified that a few days before October 31, he accompanied the defendant to Home Depot to return some home renovation supplies.

14

During that trip, the defendant said that he was "tired of being hurt from marriage." When Drew responded that the defendant would still have him so it would be okay, the defendant started to cry. This surprised Drew because he had never seen the defendant cry. Drew testified that the defendant, Neikes, and the children sometimes made the lip-syncing videos with the Dubsmash program. Drew described the Dubsmash program and indicated that the user chose the song, but the program chose which portion of the song the user would sing along to. Drew testified that he went to see the defendant shortly after he was incarcerated, and he was wearing a green "antisuicide vest."

¶ 42    The defendant's daughter, Hannah, testified that she was worried about the defendant when she spoke to him in the days leading up to the victim's murder. He came to her house unannounced, saying that he needed to talk and was heartbroken. He said he was getting a divorce and was struggling. This was unusual, as he did not normally share his feelings with her. Hannah learned that the victim was having an affair about two weeks prior to her death. When Hannah visited the defendant in jail the day after he was arrested, he was wearing a garment to restrain his arms because he was on suicide watch.

¶ 43    Travis Clark, the defendant's friend, testified that the defendant did not have an angry or violent reputation in the community. The two of them went on a motorcycle ride a day or two before the victim died, and although the defendant talked about his marriage, he did not express any anger toward the victim.

¶ 44    The defendant testified that he used the Dubsmash application, in which the user lip-syncs to a song, and that he had often used it with the victim and the kids. The defendant testified that the Johnny Cash video was made on May 5, 2015. He claimed

15

that he was using the Dubsmash application on October 26, 2016, and either deleting videos from the app or saving them to his phone. The defendant, as well as Shelby and Hannah, testified that Johnny Cash was the defendant's favorite singer.

¶ 45 The defendant testified that he thought he and the victim were happily married until mid-October 2016. Around October 25, 2016, he and the victim started discussing divorce and the division of their assets. The car would be put in her name, and she would take out a loan; she also planned to give the defendant the equity in the house, and she would also keep everything in the house. The next day, the defendant wrote suicide notes to the victim and his children after the victim left for work that night. He explained that around that time, he decided that he did not want to live anymore and wanted to use a weapon so the suicide would be quick and easy.

¶ 46 The defendant testified that on October 29, 2016, things with the victim changed again, and their relationship was like a roller coaster around that time. When they were angry with each other, they would send "not nice" texts to one another. At the same time, he explained, they tried to get along when they were together. He and the victim took Shelby and Riley to Carbondale to run errands. The defendant and the victim talked for a couple of hours after they got home; they made plans to take the children to Six Flags the next day, and she mentioned calling a marriage counselor. However, on October 30, 2016, the defendant learned that the victim had been at Burns's house again. After learning this, the defendant opted out of the trip to Six Flags; instead, he and Clark rode their motorcycles.

16

¶ 47  On October 31, 2016, the defendant and the victim were eating lunch before heading to the bank to separate their accounts when he received a text message from Veach that she was getting remarried and moving to Marion.  The defendant testified that he "kind of lost it" and cried all the way home, canceling the trip to the bank.  The defendant was upset by Veach's news because he felt that she was trying to take his son away.  This was very upsetting because Hannah's mother had done the same thing after that divorce.  The defendant and Drew had become "really close."

¶ 48  The defendant explained that he had never owned or fired a gun before October 31.  The defendant had gotten his FOID card over a year before; the victim had not done so yet.  The two of them had planned to buy a firearm at some point but had not bought one yet because of the money involved.  When he ultimately bought the gun, he told the victim and the children, and the victim saw it after he picked it up.  He agreed that he did not tell Hood, or indicate on his ISP paperwork, that he intended to use the gun to kill himself or his wife.

¶ 49  On cross-examination, the defendant was asked about the events of October 31, 2016, leading to the victim's death.  He testified that after he and Neikes arrived at his house that evening, he told Neikes he would be right back out so Neikes would not follow him into the house.  The defendant agreed that he was holding the victim's phone but denied scrolling through the messages.  He testified that he was holding it away from her so she would follow him into the garage.  When asked whether the phone was "bait" for the victim to follow him into the garage, he responded in the affirmative.  He wanted the two of them to be in the garage so he would not be in the house with the kids when he

17

shot himself. He was angry with the victim and wanted her to see him shoot himself. The defendant admitted that the victim's back was facing him when he shot her in the kitchen, although he claimed he accidentally shot her.

¶ 50 After the close of all the evidence, the jury found the defendant guilty of first degree murder and further found that he personally discharged a firearm that proximately caused the victim's death.

¶ 51 On June 20, 2018, the defendant filed a motion for new trial alleging, *inter alia*, that the trial court erred in admitting the cell phone evidence, the court erred in permitting the jury to view evidence during deliberations, and the State's closing argument was "unfairly prejudicial." The defendant's posttrial motion was denied.

¶ 52 On September 18, 2018, the trial court sentenced the defendant to 42 years' imprisonment for first degree murder and 25 years' imprisonment for the firearm enhancement, for a total sentence of 67 years' imprisonment followed by 3 years of MSR. The defendant appeals.[1]

¶ 53                                    II. ANALYSIS

¶ 54 On appeal, the defendant makes three contentions. First, he argues that the trial court abused its discretion in admitting the Johnny Cash video into evidence. Second, he asserts that the prosecutor committed misconduct during closing arguments. Third, he contends that structural error occurred when, during jury deliberations, the court allowed the jury to examine the live rounds found at the house in front of the court and the parties.

---

[1]To prevent unnecessary repetition, additional relevant facts and procedural posture will be set forth as part of our analysis in section II below.

18

¶ 55                          A. The Johnny Cash Video

¶ 56    The defendant initially asserts that the trial court abused its discretion in admitting

the Johnny Cash video into evidence.  The defendant argues that the prejudicial impact of

the evidence outweighed its probative value.  We disagree.

¶ 57    The admissibility of evidence is a matter within the sound discretion of the trial

court.  *People v. Fillyaw*, 2018 IL App (2d) 150709, ¶ 44.  Thus, a court's decision to

admit evidence will not be reversed absent an abuse of discretion.  *Id.*  An abuse of

discretion occurs where the court's decision is unreasonable, arbitrary, fanciful, or

"where no reasonable person would take the view adopted by the trial court."  *Id.*

¶ 58    Generally, evidence is admissible if it is relevant.  *People v. Pikes*, 2013 IL

115171, ¶ 21; Ill. R. Evid. 402 (eff. Jan. 1, 2011).  Evidence is relevant if it has any

tendency to make the existence of any fact of consequence to the determination of the

action more or less probable than it would be without the evidence.  *People v. Burgund*,

2016 IL App (5th) 130119, ¶ 199; Ill. R. Evid. 401 (eff. Jan. 1, 2011).  "Even relevant

evidence, however, may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice."  *Pikes*, 2013 IL 115171, ¶ 21; Ill. R. Evid. 403 (eff. Jan.

1, 2011).  Probative value "is determined by testing the proffered fact against the light of

logic, experience and accepted assumptions as to human behavior."  (Internal quotation

marks omitted.)  *Burgund*, 2016 IL App (5th) 130119, ¶ 199.

>    "Of course, all evidence is prejudicial in that it is intended to impact the
> fact finder's decision.  *** In the context of evidence admissibility, the court must
> only concern itself with that prejudice which is undue or unfair.  Evidence is
> unduly prejudicial where it will somehow cast a negative light upon a defendant

19

for reasons that have nothing to do with the case on trial." (Internal quotation marks omitted.) *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25.

¶ 59 In this case, the evidence at issue was a 10-second video that depicted the defendant lip-syncing along to a portion of a Johnny Cash song called "Cocaine Blues." As the defendant sings along to the lyrics, "I took a shot of cocaine and I shot my woman down," he raises his hand and makes a shooting motion. This evidence clearly had probative value as it tended to make a fact of consequence—that the defendant shot his wife intentionally, rather than accidentally—more probable than it would have been without the evidence. The defendant attempts to challenge the probative value of the video by arguing that it was made over a year before the victim's death. However, ISP trooper McDaniel agreed that the defendant downloaded it again on October 26, 2016, just five days prior to the murder for which the defendant was on trial. Nevertheless, we find that the date is insignificant to resolving the issue before us because the age of the video went to the weight to be given to the evidence, not to its admissibility. See *People v. Chambers*, 261 Ill. App. 3d 123, 134 (1994) (noting the remoteness of evidence goes to the weight to be given to it rather than its admissibility); see also *People v. Ward*, 2011 IL 108690, ¶ 34 (the jury is tasked with assigning weight to the evidence presented).

¶ 60 Moreover, while the video was prejudicial to the defendant in that it negatively affected his defense, such prejudice resulted from reasons having to do with the case on trial. Accordingly, we cannot say that the defendant suffered from undue or unfair prejudice. See *Gordon*, 2017 IL App (3d) 140770, ¶ 25 ("Evidence is unduly prejudicial where it will somehow cast a negative light upon a defendant for reasons that have

20

nothing to do with the case on trial." (Internal quotation marks omitted.)). Further, we find it important to note that the trial court's balancing of probative value and unfair prejudice pursuant to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) is subject to an abuse of discretion standard. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 84, *aff'd as modified*, 2019 IL 124143. Under the circumstances presented in this case, we find that the court did not abuse its discretion in determining that the probative value of the Johnny Cash video was not outweighed by the danger of unfair prejudice. Therefore, the court did not abuse its discretion in admitting the video into evidence.

¶ 61                                              B. Closing Arguments

¶ 62    The defendant also asserts that the prosecutor committed misconduct during closing arguments. He maintains that the prosecutor's alleged misconduct denied him a fair trial. The defendant admits that he did not object to all of the prosecutor's allegedly improper remarks and only included some of them in his posttrial motion.

¶ 63    A defendant's failure to object at trial and to raise an issue in a posttrial motion operates as a forfeiture of the right to raise the issue as a ground for reversal on appeal. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). The plain-error rule is a narrow and limited exception and is applied to ameliorate the harshness of strict application of the forfeiture rule. *Id.* Under the plain-error rule, a reviewing court may consider a forfeited claim when: "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of

21

the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under plain-error review, defendant bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 64 The parties here disagree as to the applicable standard of review. The defendant asserts that statements made by the prosecution during closing argument should be reviewed *de novo*. See *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."). The State maintains that such statements should be reviewed for an abuse of discretion. See *People v. Blue*, 189 Ill. 2d 99, 128 (2000) ("The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.)). Illinois courts have previously stated that, where the result would be the same under either standard, we may "refrain from discussing the applicable standard until our supreme court resolves the conflict." *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26. Because we conclude that the result here would be the same under either standard, we decline to take a position.

¶ 65 A defendant seeking reversal of his conviction based upon improper remarks made during closing argument faces a difficult burden. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48. Prosecutors enjoy considerable latitude in closing argument. *Id*. ¶ 49. Closing arguments are viewed in their entirety, and the challenged remarks must be considered in context "rather than focusing on selected phrases or remarks." *People v.*

*Runge*, 234 Ill. 2d 68, 142 (2009); *Holmon*, 2019 IL App (5th) 160207, ¶ 51. In reviewing comments made during closing arguments, the court asks whether the comments caused substantial prejudice to defendant such that it is impossible to say whether or not they resulted in a guilty verdict. *Wheeler*, 226 Ill. 2d at 123. Reversal is only warranted if the prosecutor's remarks resulted in substantial prejudice to defendant and constituted a material factor in the jury's verdict. *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010). An instruction that closing arguments are not evidence tends to cure possible prejudice from improper remarks. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 126. With these principles in mind, we consider the defendant's contentions.

¶ 66 The defendant initially argues that the prosecutor's argument as to his statement to the police improperly ignored the trial court's pretrial partial suppression order and implied that the jury should penalize the defendant for invoking his right to silence. Prior to trial, the defendant moved to suppress part of his statement to the police. After a hearing, the court granted his motion, ruling that the statement would end at the 25-minute mark just before the defendant said he no longer wished to talk. Based on the court's order, the interrogation video presented to the jury ended at that point.

¶ 67 During closing argument, defense counsel extensively recounted the defendant's statement to the police, which took place shortly after the shooting occurred. Counsel also played the video of the interrogation for the jury. Thereafter, the State's rebuttal argument began by addressing the defendant's statement. The prosecutor explained that the jury would be tasked with determining the weight to be given to the defendant's statement. The prosecutor then argued:

23

"[W]e played a post-arrest statement of this defendant in our case at the trial. You got to hear it again. You got to hear a person making a statement under a charge of first degree murder and what kind of bias and motive the person had to make those kind of statements.

We and you do not have to take the word of a person. *I'd like you to look at that statement, the length of the statement, how it starts with just the statements of the defendant, how Officer Colp then starts to question some of the statements. One answer that I see in there, I have already answered that. I already said that. Then the statement ends.*" (Emphasis added.)

¶ 68 The defendant asserts that the foregoing portion of the prosecutor's argument misrepresented his statement to the police "as one-sided, with little questioning by Colp; in fact, Colp was an active participant throughout the statement." We disagree, as the argument was a fair summary of how the interrogation went. ISP trooper Colp asked the defendant to explain what happened, and the defendant did so. As the defendant spoke, Colp occasionally interjected with questions in an attempt to guide the defendant through his version of events. After the defendant finished his explanation, Colp asked more detailed and follow up questions. We also note that the jury heard this argument shortly after hearing defense counsel's more detailed summary of the defendant's statement and watching the video itself. As such, we find that the prosecutor's statement could not have misled the jury as to Colp's participation in the interrogation.

¶ 69 The defendant additionally maintains that the argument commented on excluded evidence and suggested that the statement ended where it did because the defendant knew he was guilty. He is correct that it is improper for the State to comment on excluded evidence during closing arguments. See, *e.g.*, *People v. Mullen*, 141 Ill. 2d 394, 404 (1990). However, that is not what the prosecutor did in this case. The prosecutor merely

said that the statement ended; he did not comment on anything that happened after the statement ended, nor did he give a reason as to why the statement ended. The argument was based on the evidence and did not insinuate that the video ended because of the defendant's guilt. As such, the defendant's argument is without merit.

¶ 70 Further, the defendant, citing *People v. Meredith*, 84 Ill. App. 3d 1065 (1980), maintains that the argument was improper because it implied that the defendant had invoked his right to silence. *Meredith* is easily distinguishable from this case. There, the prosecutor stated that defendant called his attorney because he knew he shot two people. *Id*. at 1071. The reviewing court ruled that the argument constituted reversible error because it equated the exercise of defendant's constitutional right to an admission of guilt, therefore penalizing defendant for exercising his right. *Id*. at 1071-73.

¶ 71 Here, the prosecutor's comments did not raise an inference that the defendant invoked his right to silence because he knew he was guilty. The prosecutor merely reviewed what happened during the defendant's interrogation and subsequently stated that the video ended. The prosecutor did not explicitly state or imply that the video ended because the defendant invoked his right to silence, and he did not invite the jury to speculate as to why the video ended. As with his previous argument, the defendant reads an implication into the prosecutor's argument that is not there.

¶ 72 The defendant also alleges that the prosecutor repeatedly misstated the evidence and made arguments not based on the evidence. "The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and

25

law compel a favorable verdict." (Internal quotation marks omitted.) *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). In closing, a prosecutor may comment on the evidence and any fair and reasonable inferences that may be drawn from the evidence, even if such inferences reflect negatively on defendant. *Id.*

¶ 73 First, the defendant maintains that the prosecutor's assertion that he aimed and pointed the gun at the victim misstated the evidence. The prosecutor stated:

> "We heard a lot about this gun. We know it is the defendant's gun and we know this gun is in working order and we know this gun, when you point it, it fires where you point it at. And the only way this gun, from the evidence, fires is when you pull right here where I won't put my finger.
>       And so we believe that the intent involved in this case is simply established with the gun in this defendant's hand who shot his wife twice while aiming this gun at Beth Pheasant, two kill shots. One—
>       [Defense Counsel]: Objection, Your Honor. I think those are facts not in evidence, aiming the gun at Ms. Beth Pheasant.
>       THE COURT: Overruled.
>       [The State]: One shot from the back of the shoulder to the chest and one shot through the brain. It is a big old world out here. A spectrum of 360 degrees all around me and yet that's where that gun was aimed. That's where that gun was discharged, into this young woman, which was this defendant's wife."

¶ 74 In response, the defense argued that the there was "no evidence that [the defendant] pulled the trigger. The gun went off and there is evidence of that." The defense maintained that the defendant meant to kill himself and accidentally killed the victim. Defense counsel insisted that the State failed to establish that the defendant pointed the gun at the victim and pulled the trigger, relying in part on the defendant's lack of firearm experience.

¶ 75 We disagree with the defendant's contention, as we find that these statements were fair inferences from the testimony. The victim was shot in her chest and head, and it is

26

undisputed that the defendant fired the gun. Gamboe and Williams testified that the gun only fired when used properly, and they could not get it to fire accidentally. The fact that the gun fired where it was pointed or aimed is a fair and reasonable inference from that testimony. Although the defendant claimed that the gun malfunctioned, with support from Hood's testimony that there was a "little hiccup" with the gun, Gamboe and Williams testified that the firearm was manufactured after the recall circumstance was resolved and was not a part of the recall. Nevertheless, the prosecutor was allowed to argue the fair and reasonable inferences based on the evidence, even if they negatively reflected on the defendant. See *id*. As such, the State's argument was not improper.

¶ 76    Second, the defendant challenges the prosecutor's statement that:

> "And Dr. Heidingsfelder found the manner of death to be homicide. Not accident. You remember that sequence of questions? That was one of the choices. They may have a different—a little bit different—it is not the same decision you are making. I'll tell you that. This is your decision whether this is a first degree murder or something else. But that was his opinion."

This is a fair recollection of Dr. Heidingsfelder's testimony, in which he said the cause of the victim's death was a homicide, which he clarified meant "the killing of one person by another person" and was not a conclusion as to whether the shooting was accidental or not. However, Dr. Heidingsfelder also opined that the victim's death did not appear to be accidental because it involved two gunshot wounds. In light of this testimony, the prosecutor's remarks were not improper.

¶ 77    Third, the defendant complains of the prosecutor's argument that, "Trisha Pheasant [(n/k/a Veach)] told you a lot more than that. She told you about *** having an order of protection against this defendant, having physical fights with this defendant,

27

having verbal arguments with this defendant during their marriage." This was not a misstatement of the evidence, as Veach did not deny that she and the defendant fought physically. Rather, she admitted to being the aggressor of some of the violence. In light of Veach's testimony, and the context of the closing arguments as a whole, we find that the prosecutor's statements were not reversible error.

¶ 78 Lastly, the defendant contends that the prosecutor's argument that the defendant used the victim's phone as bait for her to follow him into the garage was not based on the evidence. The prosecutor specifically stated that the defendant was "fighting with his cell phone, which he calls bait as he testified before you. His words. He gets her in the garage, pulls out his gun that he had behind him." In rebuttal, the State argued that the defendant "made a choice to get that gun and take that gun into that house and, in his words, baited Ms. Pheasant to the garage where he shot her."

¶ 79 Although the defendant did not use the word "bait" himself, he agreed when the State asked him if he used the cell phone as bait. Thus, although the prosecutor's statement that the defendant used the word "baited" was incorrect, we cannot conclude that it constituted reversible error when considering it in light of the defendant's testimony and in context of closing arguments as a whole.

¶ 80 In sum, we find that the complained-of comments during closing arguments were not improper and did not rise to the level of prosecutorial misconduct. Further, we note that the jury was twice instructed that closing arguments are not evidence and should not be considered by it as evidence. Therefore, any error that may have occurred was sufficiently cured. See *Sangster*, 2014 IL App (1st) 113457, ¶ 126.

28

¶ 81                              C. Jury Deliberations

¶ 82     The defendant's third and final contention on appeal is that structural error occurred when, during jury deliberations, the trial court allowed the jury to examine the live rounds found at the defendant's house in front of the court and the parties.  He argues that the procedure by which the court allowed the jury to view the evidence violated his right to a fair and impartial jury by intruding on the secrecy and privacy of jury deliberations.  At trial, the defendant and his counsel agreed to the procedure utilized by the court; however, the issue was raised in his posttrial motion.

¶ 83     In his opening brief, the defendant primarily relied on the Third District Appellate Court's decision in *People v. Hollahan*, 2019 IL App (3d) 150556, which held that a procedure the trial court employed to allow the jury to view a video during deliberations amounted to plain error.  After the defendant filed his initial brief, however, our supreme court reversed that decision in *People v. Hollahan*, 2020 IL 125091, *cert. denied sub nom.*, *Hollahan v. Illinois*, No. 20-7240, 2021 WL 1074443 (Mar. 22, 2021).  In his reply brief, the defendant agreed that the supreme court's decision in *Hollahan* controls our analysis of this issue.

¶ 84     The trial court's decision as to whether and how to respond to the jury's request to view evidence is reviewed for an abuse of discretion.  *Id*. ¶ 11.  Because the defendant failed to preserve this claim of error by objecting to the procedure at trial, the claim is considered forfeited unless we deem it to be plain error.  See *Harvey*, 211 Ill. 2d at 385.  The plain-error doctrine allows a reviewing court to consider an unpreserved error when a clear or obvious error occurred and the evidence at the trial was closely balanced or that

error was so egregious as to deny a defendant a fair trial. *Piatkowski*, 225 Ill. 2d at 565. However, the first step in plain-error review is to determine whether any error has been committed at all. *Thompson*, 238 Ill. 2d at 613.

¶ 85 In *Hollahan*, after the jurors retired to deliberate, they asked to view a video in evidence. *Hollahan*, 2020 IL 125091, ¶ 4. The trial court granted the jury's request, and the jury viewed the video in the courtroom because the court did not have the necessary arrangements to allow the jury to view it in the jury deliberation room. *Id.* The court also allowed the parties and two alternate jurors to remain in the courtroom while the jury viewed the video. *Id.* Defense counsel did not object to this procedure. *Id.* Before the jury was brought into the courtroom, the court admonished the parties and the alternate jurors that the jury would be watching the videos and that " '[n]o one will have any conversation.' " *Id.* When the jury was brought into the courtroom, the court advised the jury that it was unable to have the video shown in the jury deliberation room and that the court had " 'instructed everyone to not say a word.' " *Id.* After watching the video, the jury returned to the jury room to resume deliberations and subsequently found defendant guilty. *Id.* Our supreme court concluded that no error occurred because no deliberations took place while the jurors were watching the video in the presence of nonjurors, and there was no communication with nonjurors. *Id.* ¶ 27.

¶ 86 During trial in the present case, the defendant maintained that as he repeatedly attempted to commit suicide, his gun jammed and bullets fell out the gun's breech, and he accidentally shot the victim. The State disputed this theory, arguing in part that the live rounds did not contain any marks that would indicate a gun malfunction. Before the jury

30

retired to deliberate, the trial court and the parties all agreed that the five 9-millimeter live rounds should not go back to the jury room. During deliberations, however, the jury requested to see those live rounds. The State had no objection; defense counsel said that she was not sure what she thought but believed that the jury was looking for toolmarks. Given that, and after viewing the exhibits, defense counsel asserted that the request should either be denied, or the jury should be able to examine them.

¶ 87 The trial court proposed that the jury be brought into the courtroom to view the evidence and then returned to the jury room to continue deliberations. The court wanted the jury's examination to be under supervision of the court and counsel because of the nature of the evidence and the possibility of harm. The defendant did not object to the proposed procedure, and defense counsel ultimately agreed that the jurors needed to be able to view the bullets and handle the boxes. The court warned, "We can't talk to the jury." Once the jury was brought into the courtroom where the court and counsel were present, the bailiff handed one exhibit at a time to the jurors to pass around and examine, until this process had been completed as to each of the five live rounds. After the viewing was finished, the jury returned to the jury room and resumed deliberations.

¶ 88 The record reveals that the jurors did not deliberate while they were viewing the live rounds or that the parties communicated, either verbally or nonverbally, with the jurors. As such, the record does not show that the presence of the trial court or the parties compromised the secrecy or privacy of the jury's deliberations. We therefore find no error in the agreed-upon procedure utilized by the court. In the absence of error, there can be no plain error.

¶ 89                    III. CONCLUSION

¶ 90    For the foregoing reasons, the judgment of the circuit court of Franklin County is

hereby affirmed.


¶ 91    Affirmed.